# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 22, 2009

Charles R. Fulbruge III
Clerk

Nos. 06-70044

JOHN WADE ADAMS

Petitioner-Appellant-Cross-Appellee

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee-Cross-Appellant

Appeals from the United States United States District Court
for the Northern District of Texas
USDC No. 3:02-CV-2042

Before SMITH, WIENER, and OWEN, Circuit Judges.

PER CURIAM:[*]

Petitioner John Wade Adams, convicted of capital murder in Texas and
sentenced to death, received federal habeas corpus relief in district court based
on ineffective assistance of counsel ("IAC") for his trial lawyer's deficient
mitigation investigation. Adams now seeks a certificate of appealability ("COA")
on three grounds for which the district court denied habeas relief, *viz*., (1) his

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

trial counsel's failure to object to the prosecution's improper and prejudicial jury argument constituted IAC; (2) the prosecution's failure to reveal impeachment evidence constituted a denial of due process; and (3) the state trial court's erroneous exclusion of a member of the venire violated Adams's Sixth Amendment rights. Respondent Nathaniel Quarterman (the "State") cross-appeals the district court's grant of habeas relief. Concluding both that Adams's trial counsel was ineffective by virtue of his constitutionally deficient mitigation investigation which prejudiced Adams and that Adams fails to make a substantial showing of the denial of any other constitutional right, we affirm the district court's grant of habeas relief for IAC and we deny a COA on Adams's remaining claims.

## I. FACTS AND PROCEEDINGS

A Dallas County jury convicted Adams on a charge of capital murder for the 1997 stabbing death of Donna Vick. Adams's co-defendant Gregory Edward Wright was convicted of the same offense, sentenced to death, and executed on October 30, 2008.

Vick was a "street minister" to the homeless. In the days before her murder, Vick invited the homeless Wright to reside in her house in exchange for doing yard work. Adams, also apparently homeless at the time, was a friend of Wright's. In March 1997, Wright and Vick met Adams at the home of Llewelyn Mosley, then left together in Vick's car. They went first to a bar, the "VFW Club," then, in the early hours of the next morning, went to Vick's home. There, they stabbed her to death in her bed with a pocket knife owned by Adams and with a butcher knife from Vick's kitchen, then stole various items from the house, left in Vick's car, and drove to Mosley's house. Later that day, Jeremiah Tatum arranged for Adams and Wright to swap the items from Vick's house for $50 worth of crack cocaine. A neighbor, Jerry Causey, let the group borrow a truck to haul the stolen goods.

The next day, Adams got drunk and reported the murder to the Dallas Police Department. Adams led the police to Vick's body, to her abandoned vehicle, to one of the knives, and to Wright.

At Adams's 1998 trial, Mosley testified that after the murder Adams and Wright were happy and excited, exchanging high-fives. Tatum testified that Adams was angry about the terms of the $50 crack-cocaine deal and that he remarked, "Man, I just killed for this shit." Tatum also testified that Adams said Wright didn't have the heart to finish the job, so Adams "had to kill the bitch." Causey testified that Adams told him, "I already done killed one bitch and I'll kill another one." Adams testified in his own defense, denying the statements that the State's witnesses attributed to him, accusing them all of lying, and claiming that he had refused to participate in the stabbing of Vick. The jury convicted Adams of capital murder.

To prepare for the punishment phase of trial, Adams's attorney, David Pickett, spoke to Adams's mother and stepfather but found that they were not particularly helpful or interested in testifying. Pickett hired an investigator, Michael Christopher, to look for mitigating evidence. Christopher talked with Adams's mother and one of his brothers but found nothing very helpful. Adams claims that he provided Pickett with the names of other family members and his foster mother, but neither Pickett nor Christopher contacted them. Based on the information collected and his knowledge of aggravating factors that would be admissible if mitigation evidence were introduced, Pickett decided not to present mitigation evidence. Instead, his strategy at the punishment phase was to portray Wright as the instigator and Adams as only an accomplice and to stress that Adams reported the murder to police and cooperated with the investigation.

In this phase of the trial, the jury affirmatively answered the question whether Adams would be a future danger to society and negatively answered the question whether mitigating circumstances warranted a sentence of life

imprisonment rather than death. Accordingly, the trial court sentenced Adams to death. On direct appeal, the Texas Court of Criminal Appeals ("TCCA") affirmed Adams's conviction and sentence. Thereafter, the U.S. Supreme Court denied review.

Adams then filed an application for writ of habeas corpus in Texas state court. The state habeas court issued detailed findings of fact and conclusions of law, recommending that relief be denied. Based on these findings and an independent review of the record, the TCCA denied habeas relief. Adams then filed his federal petition for writ of habeas corpus. The magistrate judge granted Adams leave to depose his trial attorney, Pickett, and granted Adams's motion to expand the record to include that deposition. Holding that the state court denied Adams an opportunity to develop the factual basis for his claim that Pickett had failed to investigate mitigating evidence, the magistrate judge ordered an evidentiary hearing. Only Pickett and his retained investigator, Christopher, testified at that hearing.

Adopting the magistrate judge's findings of fact and conclusions of law, the district court granted Adams habeas relief on the ground that Pickett was ineffective for failing to investigate substantial, readily available mitigating evidence and that this failure prejudiced Adams. The court denied Adams's other claims for habeas relief, including, *inter alia*, the three for which he now seeks a COA from us. The State appeals the district court's grant of habeas relief for IAC, and Adams seeks a COA on the aforesaid three grounds that the district court rejected.

## II. STANDARDS OF REVIEW

Adams filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so his

4

petition is governed by AEDPA.[1] Our review is limited by AEDPA, which provides that habeas relief may not be granted unless (1) the state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[2] "A decision involves an unreasonable application of Supreme Court precedent if it 'unreasonably extends a legal principle from [Supreme Court precedent] to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'"[3] "[A] decision is contrary to clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent].'"[4] Merely incorrect state court decisions do not constitute unreasonable applications of federal law; instead, the decision must be objectively unreasonable.[5] We presume that a state court's factual findings are correct, and the petitioner has the burden of rebutting those findings by clear and convincing evidence.[6]

---

[1] *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

[2] *Reed v. Quarterman*, 555 F.3d 364, 367 (5th Cir. 2009) (quoting 28 U.S.C. § 2254(d)(1) (2006)).

[3] *Oliver v. Quarterman*, 541 F.3d 329, 334 (5th Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000)), *cert. denied*, 2009 U.S. LEXIS 3044 (Apr. 20, 2009).

[4] *Id.* (quoting *Williams*, 529 U.S. at 405).

[5] *Virgil v. Dretke*, 446 F.3d 598, 604 (5th Cir. 2006).

[6] *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *petition for cert. filed* (Feb. 9, 2009) (No. 08-8668); *see* 28 U.S.C. § 2254(e)(1).

Before a petitioner may appeal a denial of habeas relief, he must, as a matter of subject-matter jurisdiction, secure a COA pursuant to AEDPA.[7] We may only grant a COA if the petitioner makes "a substantial showing of the denial of a constitutional right."[8] In making this determination, "[w]e conduct a 'preliminary, though not definitive' evaluation — a so-called 'threshold inquiry' — of the petitioner's arguments and must issue a COA if 'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"[9] In death-penalty cases, we resolve in favor of the petitioner any doubts whether a COA should issue.[10]

## III. ANALYSIS

### A. Direct Appeal: IAC for Deficient Mitigation Investigation

#### 1. Applicable Law

IAC is "a mixed question of law and fact, which we review *de novo*."[11] If not clearly erroneous, however, we credit the trial court's express or implied findings of discrete, historic facts.[12]

We review claims of IAC under the two-prong test of *Strickland v. Washington*:[13] Relief may be granted only if the petitioner demonstrates both (1) that counsel's performance was deficient, *viz.*, "counsel was not functioning as

---

[7] *Moore v. Quarterman*, 534 F.3d 454, 459 (5th Cir. 2008). No COA is required when the State is the appellant. *DiLosa v. Cain*, 279 F.3d 259, 262 n.1 (5th Cir. 2002) (citing FED. R. APP. P. 22(b)(3)).

[8] 28 U.S.C. § 2253(c)(2).

[9] *Moore*, 534 F.3d at 459–60.

[10] *Id.* at 460.

[11] *Ladd v. Cockrell*, 311 F.3d 349, 357 (5th Cir. 2002).

[12] *Sayre v. Anderson*, 238 F.3d 631, 634–35 (5th Cir. 2001).

[13] 466 U.S. 668 (1984).

the 'counsel' guaranteed . . . by the Sixth Amendment, " and (2) that such deficient performance prejudiced the petitioner, *viz.*, counsel's deficient performance "deprive[d] the defendant of a fair trial, a trial whose result is reliable."[14]

In determining whether counsel's performance was deficient, we employ an objective standard of "reasonableness under prevailing professional norms."[15] We begin with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[16] "Prevailing norms of practice as reflected in American Bar Association Standards and the like . . . are guides to determining what is reasonable, but they are only guides."[17]

When a "petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence . . . [and] counsel attempt to justify their limited investigation as reflecting a tactical judgment," the deference owed to such a strategic judgment turns on "the adequacy of the investigations supporting those judgments."[18] "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that

---

[14] *Id.* at 687.

[15] *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted).

[16] *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted).

[17] *Id.* at 688. We reference the version of the ABA Guidelines in place at the time of the defendant's trial. *See Sonnier v. Quarterman*, 476 F.3d 349, 358 n.3 (5th Cir. 2007). Because the Supreme Court did not reference the ABA Guidelines for the Appointment of Counsel in Death Penalty Cases until 2005, *see Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005), the State contends that our *Strickland* analysis in the instant pre-2005 case should not reference these Guidelines as the "prevailing norms of practice." This argument is not compelling and we instead consider the ABA's Guidelines as embracing the prevailing norms of the time even before the Supreme Court explicitly referenced them.

[18] *Wiggins*, 539 U.S. at 521.

reasonable professional judgments support the limitations on investigation."[19] The question "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*."[20] "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences."[21] That is, "[g]enerally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character."[22] Yet, *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case."[23]

In our analysis of *Strickland*'s prejudice prong, we ask "'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"[24] "A reasonable probability is a probability sufficient to undermine confidence in the outcome," but "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."[25] We re-weigh the mitigating and the aggravating evidence

---

[19] *Id.* (citation omitted).

[20] *Id.* (emphasis in original).

[21] *Id.* at 524 (citing ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES § 11.8.6, at 133 (1989)) (emphasis in original).

[22] *Miniel v. Cockrell*, 339 F.3d 331, 344 (5th Cir. 2003).

[23] *Wiggins*, 539 U.S. at 533.

[24] *Belyeu v. Scott*, 67 F.3d 535, 538 (5th Cir. 1995) (quoting *Strickland*, 466 U.S. at 695).

[25] *Strickland*, 466 U.S. at 694.

looking to "the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding."[26]

## 2. Preliminary Issue: District Court's Evidentiary Hearing

The district court determined that 28 U.S.C. § 2254(e)(2) did not preclude holding an evidentiary hearing to address a perceived factual dispute regarding trial counsel's investigation into Adams's childhood. In cases involving petitions for writs of habeas corpus under AEDPA, we review a district court's decision to hold an evidentiary hearing for abuse of discretion.[27] The State argues that holding the hearing constituted abuse of discretion because the IAC inquiry involves both the performance *and* prejudice prongs, and that the district court granted an evidentiary hearing regarding performance when lack of prejudice independently foreclosed relief.

Title 28 U.S.C. § 2254(e)(2) "states that if an applicant has failed to develop the factual basis of his claim in state court proceedings, a federal court should not hold an evidentiary hearing on the claim."[28] Under this standard, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault attributable to the prisoner or the prisoner's counsel."[29] In addition to exercising diligence in developing a factual basis in state court, to obtain an evidentiary hearing, a petitioner must show that "if proven true, his allegations would entitle him to relief."[30]

---

[26] *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000).

[27] *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007).

[28] *Conner v. Quarterman*, 477 F.3d 287, 293 (5th Cir. 2007).

[29] *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

[30] *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000); *see* 28 U.S.C. § 2254(e)(2)(B) (requiring that the facts "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have" sentenced Adams to death).

In the instant case, the district court acted within its discretion. Adams made numerous requests in state court for an evidentiary hearing or to depose witnesses in connection with his mitigation-based claim. The state court denied these requests and accepted only affidavits that the parties could obtain from witnesses who voluntarily cooperated. Adams was left with no means to prove his allegations related to trial counsel Pickett's mitigation investigation. Yet, the state habeas court, relying on the fact that Adams had failed to prove those same allegations, denied relief. It was not an abuse of discretion to conclude that Adams exercised due diligence in attempting to develop the factual basis for his mitigation-based claim in state court.[31] Additionally, as confirmed by our discussion below, the facts that Adams intended to prove would have entitled him to relief.

### 3. Trial Counsel's Performance

The State asserts that Adams cannot mount a meritorious claim grounded in Pickett's allegedly deficient mitigation investigation given that Adams purportedly instructed Pickett not to contact Adams's family. Even assuming Adams issued such an instruction, we disagree.

First, the State's reliance on *Schriro v. Landrigan*[32] is misplaced. There, the Supreme Court stated that if a defendant issues an instruction to counsel not to present any mitigating evidence, counsel's failure to investigate cannot constitute IAC.[33] In contrast, the Supreme Court noted that *Rompilla v. Beard* presented a different situation, one in which "the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not

---

[31] *See Williams*, 529 U.S. at 437 ("[C]omity is not served by saying a prisoner has failed to develop the factual basis of a claim where he was unable to develop his claim in state court despite diligent effort." (internal quotation marks omitted)).

[32] 550 U.S. 465 (2007).

[33] *Id.* at 475.

want mitigating evidence presented."[34] In the instant case, there is no evidence that Adams instructed counsel not to present mitigating evidence. Even if Adams had instructed Pickett not to contact family members and presumably not to present mitigating evidence derived directly from them, Pickett was not relieved of conducting a mitigation investigation:

> [A] defendant's desires not to present mitigating evidence do not terminate counsel's responsibilities during the sentencing phase of a death penalty trial: The reason lawyers may not "blindly follow" such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit.[35]

It is widely accepted that family members do not represent the only potential avenue of mitigating evidence.[36] Thus, an instruction not to contact a defendant's family members does not equate with a blanket instruction not to investigate or present *any* mitigating evidence. In any event, it is unclear here whether (1) Adams actually instructed Pickett not to contact his family and (2) Pickett adequately explained to Adams the importance of mitigating evidence.[37] Adams gave Pickett his mother's telephone number, an act that appears to contradict any intention that Pickett not contact Adams's family members. Further, Pickett now recognizes that Adams's wishes would not have determined

---

[34] *Id.* at 478 (citing *Rompilla v. Beard*, 545 U.S. 374, 381 (2005)).

[35] *Wood v. Quarterman*, 491 F.3d 196, 203 n.7 (5th Cir. 2007) (internal quotation marks and citation omitted), *cert. denied*, 128 S. Ct. 1087 (2008).

[36] *See, e.g.*, *Neal v. Puckett*, 286 F.3d 230, 238 (5th Cir. 2002) (en banc) (per curiam) (looking to affidavits of school, hospital, and prison staff).

[37] *Cf. Schriro*, 550 U.S. at 479 ("[I]n [defendant's] presence, his counsel told the sentencing court that he had carefully explained to Landrigan the importance of mitigating evidence, especially concerning the fact that the State is seeking the death penalty." (internal quotation marks omitted)). The Supreme Court, however, has not specifically "imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Id.*

the course of Pickett's investigation: He "would have gone ahead and conducted whatever investigation [he] thought appropriate, regardless of what [Adams] wanted done," i.e., he would have conducted *what he considered* to be a sufficient mitigation investigation. Whatever Adams's instructions were, they did not have a substantial bearing on the extent of Pickett's mitigation efforts.

Neither are we satisfied that this is a case in which the defendant's family was unwilling or unable to help at the time of trial. If that were the situation here, the fact that Pickett had "little family history with which to work [would] not [be] due to ineffective representation but to the predicament [Adams] created for himself."[38] It is true that Pickett and his investigator, Michael Christopher, spoke with Adams's mother, his stepfather, and one sibling, none of whom was particularly informative or willing to aid in Adams's defense. Yet, three uncooperative family members does not an unwilling family make. It appears that several of Adams's family members would have been willing to assist in his defense. For example, Adams's habeas counsel filed affidavits from two half-sisters, an aunt, and Adams's foster mother, none of whom were contacted by Pickett, but all of whom indicated a willingness to testify and assist Adams if only they had been contacted. And, it is troubling that Pickett, without accepting responsibility for his own investigation, seems to have expected Adams's family members to come forward independently, irrespective of Pickett's investigative efforts. He testified: "I mean if there was somebody out there that had this information, they needed to have come forward. Nobody from his family came forward."

Consistent with this skewed perspective, Christopher testified at the district court's evidentiary hearing that he knew Adams had five or six siblings but made no effort to contact them. Instead, Christopher expected Adams's

---

[38] *Martinez v. Dretke*, 404 F.3d 878, 886 (5th Cir. 2005).

mother to instruct the siblings to contact Christopher if they were interested in assisting with the case. And, Pickett gave Christopher no additional guidance whether to conduct a more active investigation. Christopher testified that he could have tracked down all of Adams's siblings for $250 and that if he did not have their names, he still could have located them at a cost of $500. But, Christopher apparently would have done this only if Pickett had instructed him to do so. Christopher further testified that Adams did not volunteer, and Christopher either did not ask Adams about, or does not recall asking Adams about, information regarding abuse, neglect, and other possibly mitigating evidence. Consistent with the testimony of Pickett and Christopher, Adams's affidavit states that neither of those two ever communicated to him the importance of mitigating evidence. Christopher also conceded that in most cases it is essential to investigate a defendant's social, medical, psychological, educational, abuse, and other histories, but that in this case he did not investigate these areas, because "[Christopher] do[es only] what [he's] asked to do" and Pickett never made such a request.

In the absence of a sufficient investigation of Adams's background, it was impossible for Pickett to make a strategic decision to pursue his stated mitigation theory that emphasized Adams's cooperation with police and his relatively lesser participation in the murder. When, as here, counsel does not conduct an investigation sufficient to enable him to reach an *informed decision*, we must reject the assertion that counsel made a strategic choice not to emphasize the defendant's background.[39] It is also apparent now that Pickett concedes that his decision was not particularly informed. When asked if he would have considered presenting the subsequently uncovered mitigation

---

[39] *See Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000) ("[T]he assertion of a 'strategic decision' must be rejected because no *informed* decision was made." (emphasis in original)).

evidence, Pickett responded that he "would have considered it . . . [but] can't say whether [he] would have used it or not." Such a statement is not that of an attorney who, at trial, affirmatively made a strategic decision not to present such evidence. Further, Pickett's trial emphasis on Adams's cooperation with police and relative role in the offense would have been wholly consistent with stressing mitigating factors from Adams's childhood.[40] Of course, if Pickett had conducted an investigation reasonably sufficient to support an informed strategy not to present evidence related to Adams's background, we would owe that decision substantial deference.[41] The instant case is distinct from those in which trial counsel investigates a defendant's background, uncovers so-called double-edged evidence, and then makes a strategic choice not to present the evidence because of its potentially aggravating effect.[42] On the discrete facts of this case, Pickett did not fulfill his "obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances."[43] A reasonable attorney would have investigated further before deciding not to present mitigating evidence.[44]

---

[40] *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (indicating that evidence of a defendant's background is relevant because a defendant with a disadvantaged background or one of emotional and mental problems may not be as culpable as other defendants).

[41] *Neal*, 286 F.3d at 236–37 (emphasizing that we "do not assume that counsel's performance is deficient 'merely because we disagree with trial counsel's strategy'" (quoting *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999)).

[42] *See Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997).

[43] *Neal*, 286 F.3d at 236–37 (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332–33 (5th Cir. 1983)).

[44] *See id*; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003) ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a defendant's] background *was itself reasonable*." (emphasis in original)); *id.* at 523–24 ("[I]nvestigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence . . . .'" (quoting ABA GUIDELINES FOR THE APPOINTMENT AND

We conclude that Pickett's investigation was insufficient as a matter of law. Even with such assistance as Christopher provided, Pickett failed to make even the most cursory inquiry into the existence of potentially mitigating evidence in Adams's background. The contrary state habeas court and TCCA rulings are not merely incorrect; both are contrary to and unreasonable interpretations of clearly established federal law.

### 4. Prejudice

Having concluded that Pickett's mitigation investigation was deficient, we ask whether Adams was thereby prejudiced. The State urges that when the district court evaluated the extent of available prejudicial evidence, it erred by relying on unsubstantiated affidavits. We disagree. It is true that "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative."[45] Yet, we have generally restricted this principle to a petitioner's conclusional statements about that which someone else might have said.[46] When a petitioner comes forward with affidavits from those non-testifying witnesses attesting under oath as to (1) what they would have said at trial and (2) that in fact they would have testified at trial if they had been asked, we are chary to reject the

---

PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES § 11.4.1(C), at 93 (1989) (emphasis in original)).

[45] *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986).

[46] *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) ("[The defendant] has not established what information these witnesses would have provided."); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (noting that the defendant did "not provide affidavits from the alleged eyewitnesses or indicate what testimony the eyewitnesses would give"); *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001) (the defendant did not identify any favorable witnesses); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (the defendant did not identify what favorable testimony uncalled witnesses would have provided).

uncalled witnesses' statements.[47] Further, the affidavits at issue here do not involve statements that would be inadmissible hearsay.[48] For Adams "'to demonstrate the requisite *Strickland* prejudice, [he] must show not only that [the] testimony would have been favorable, but also that the witness[es] would have testified at trial.'"[49] For a court to make this kind of inquiry based on uncalled witnesses' affidavits is non-controversial; many courts regularly assess affidavits as competent evidence.[50]

Pickett did not present any witnesses during the punishment phase of Adams's trial and, during his brief closing, Pickett's co-counsel Hugh Lucas, did not make any mitigation argument based on Adams's background. Lucas focused instead on (1) Adams's lesser guilt relative to that of Wright, (2) Adams's cooperation with police, and (3) the fact that Vick's murder was a "one-time situation" for Adams.

If Pickett had conducted even a minimally sufficient investigation, he would have discovered the existence of substantial evidence that might have influenced the jury to determine that mitigating factors required a sentence of life imprisonment rather than death. For example, Adams's half-sister, Bobbie

[47] *See Miller v. Dretke*, 420 F.3d 356, 362–63 (5th Cir. 2005) (considering how uncalled physicians would have testified when it was fairly certain what the substance of the witnesses' testimony would have contained); *United States v. Cockrell*, 720 F.2d 1423, 1427–28 (5th Cir. 1983) (distinguishing between a defendant's "own speculations as to what [a witness] might have been able to contribute" and a witness's affidavit consisting of his proposed testimony).

[48] *Cf. Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir. 2000) (labeling as "particularly suspect" affidavits from individuals stating that someone other than the defendant had privately confessed to them that he, not the defendant, was guilty of the murder (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993))).

[49] *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)) (first and second alterations in original).

[50] *But see Wilkerson v. Cain*, 233 F.3d 886, 893–84 (5th Cir. 2000) (Garza, J., specially concurring) (cautioning against relying on affidavits and indicating a preference for live hearings in which the court may evaluate an affiant's reliability). We note that the state habeas court also considered the affidavits from Adams's family members.

Dale Satterlee, would have testified about the abuse his mother and stepfather inflicted on Adams.[51] Another half-sister, Patricia Guillory, would have testified about similar abuse.[52] And a third half-sister, Deborah Chase, would have testified about additional abuse and deprivation.[53]

Moreover, Adams's foster mother, Linda Elliott, would have told the jury that when she first encountered Adams in his family's mobile home, he was two years old, and neither he nor his siblings had eaten in three or four days and did not know where their parents had gone.[54] She would also have testified that, at the time, Adams was covered in what Elliott thought were cigarette burns and was in a condition that she described as "almost a wild child." Adams lived with the Elliotts for seven years and apparently became "a happy child" and a good student without a violent streak. Elliott also would have told the jury that several years after they took Adams in, his mother attempted to extort $5,000 from the Elliotts for "the privilege of continuing to keep John," and that when this attempt failed, his mother was able to regain custody of Adams through court proceedings in which she offered perjured testimony. According to Elliott, after Adams's mother regained custody, he "never had a chance," and if Adams's mother had not interfered, Adams would have "had a good life . . . and . . . would have gone to college too."

---

[51] For example, she stated: "Mama beat [Adams] up. He was on the floor and she was kicking him and stomping on him"; Adams stepfather would "hit John with his hand, slap him upside the head. He would hit John in the head or face."

[52] For example, she stated: "[I]f [Adams's stepfather] saw one of the kids put his hand on the wall, he would sneak up behind you and slap [the] shit out of you"; "Mama would hit me with switches so bad my legs would bleed. She also used belts and a razor strap."

[53] For example, she stated: "John was whipped with a belt"; "You never really knew what circumstances you would wake up to. You never even knew if there would be food in the house."

[54] Deborah Chase recalls the events differently and states that Adams's mother placed the children with the Elliotts.

17

In addition to these affidavits, the affidavit of Dr. Paula Lundberg-Love, a professor of psychology at the University of Texas at Tyler, was submitted in the state habeas proceedings. After conducting a clinical interview and psychological testing of Adams, reviewing his prison records, reading the affidavits of family members, and consulting a summary of the evidence presented at Adams's trial, Dr. Lundberg-Love concluded that he suffers from bipolar disorder, alcohol and drug dependence, and a personality disorder with borderline and antisocial features. Dr. Lundberg-Love determined that "many of the psychological problems experienced by John may be sequelae of the neglect, physical, and psychological abuse that he experienced during childhood" and that "it is not difficult to see how John Adams' history of major child abuse and neglect has had a profound impact upon his psychological, intellectual, and social development."[55]

The State contends that the post-conviction affidavits are "double-edged," and that if the affiants had so testified at trial, the State would have impeached any mitigating evidence with evidence of, *inter alia*, Adams's childhood thefts, teenage marijuana use, absence without leave from the Army, gang affiliation, and racist attitude. We recognize that the State may have followed such a strategy at the trial's punishment phase, but we cannot conclude that the aggravating effect of this evidence would have outweighed the mitigating evidence in a reasonable jury's minds.

We acknowledge that, as Wright's execution date neared, Adams wrote letters and answered interrogatories stating that he was Vick's murderer, that

---

[55] Although it may be reasonable for an attorney to make a strategic choice not to present testimony of a psychological expert given that it could open the door to the State's presenting its own aggravating psychological evidence, in this case Pickett made no effort to obtain sufficient information to determine whether evidence from an expert like Dr. Lundberg-Love would have been useful. We re-emphasize that Pickett violated his independent duty to investigate.

he had framed Wright, and that because Adams had found God in 2005, he now felt that he should tell the truth. Yet, at a hearing, Adams conceded that the letters were false and written for the sole purpose of delaying Wright's execution.[56] We concluded in Wright's case that Adams's "letters are false and not persuasive."[57] Nothing today causes us to question that prior determination, and Adams's letters do not affect our prejudice analysis.

We conclude that Pickett's insufficient investigation prevented his discovery of substantial, readily available mitigating evidence of Adams's childhood abuse, neglect, and abandonment. A reasonable probability exists that, absent these errors (and even when considering the aggravating aspects of Adams's crime), a jury would have determined that "'the balance of aggravating and mitigating circumstances did not warrant death.'"[58] The conflicting rulings of the state habeas court and the TCCA are contrary to, or an unreasonable interpretation of, clearly established federal law. We therefore affirm the district court's grant of habeas relief on the ground of IAC. Adams is entitled to a new punishment-phase trial.[58]

## B. COA Issue One: IAC for Failure to Object

### 1. Applicable Law

The *Strickland* IAC standard described above also applies to Adams's claim based on Pickett's failure to object to the State's jury argument. Adams's burden here, however, is two-fold:

---

[56] *In re Wright*, 298 F. App'x 342, 343 (5th Cir. 2008) (per curiam) (unpublished).

[57] *Id.* at 344.

[58] *Martinez v. Quarterman*, 481 F.3d 249, 254 (5th Cir. 2007) (quoting *Strickland v. Washington*, 466 U.S. 668, 695 (1984)).

[58] We express no view on whether, after sufficient investigation, competent counsel should present mitigating evidence on retrial or, if so, what the nature and extent of such evidence should be.

In federal habeas actions, improper jury argument by the state does not present a claim of constitutional magnitude unless it is so prejudicial that the petitioner's state court trial was rendered fundamentally unfair within the meaning of the Fourteenth Amendment's Due Process clause. To establish that a prosecutor's remarks are so inflammatory as to prejudice the substantial rights of a defendant, the petitioner must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.

The requisite showing is a difficult one for a criminal defendant to establish on appeal. The burden is even more difficult in this case because [Adams] must not only show [1] improper jury argument rising to the level of a constitutional impairment of a fundamentally fair trial, but he must also show [2] that his trial counsel was constitutionally ineffective in failing to object to the argument . . . .[59]

Further, in addition to *Strickland*'s presumption that counsel's conduct falls within the wide range of reasonable professional assistance, the nature of Adams's particular argument here requires him to overcome a substantial barrier to relief: "A decision not to object to a closing argument is a matter of trial strategy," and we have previously declined to disturb a state habeas court's conclusion that failure to object at closing did not render trial counsel's assistance ineffective.[60]

## 2. Failure to Make a Substantial Showing of IAC for Failure to Object

Pickett, in his closing argument of the trial's guilt-innocence phase, referred to various prosecution witnesses as "'outlaws' and 'deal-makers,' who because of charges pending against themselves, fashioned their testimonies to

---

[59] *Bridge v. Lynaugh*, 838 F.2d 770, 774 (5th Cir. 1988) (internal citations and quotation marks omitted).

[60] *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992).

fit what they believed the police wanted them to say." In response, during the State's closing argument, the prosecutor argued:

> [I]f there's a one of you, even one of you on this jury who believes that I have somehow cut some sort of implied, express or otherwise, deal with any of these witnesses, if any of you believe that I have attempted to defraud you, the Court, and this criminal-justice system somehow in this case, when you go back there to that jury room, I want you to do something for me.
>
> Before you decide whether this man is guilty or not guilty of this crime, if a one of you believes that's occurred, you say not guilty . . . . But, I'm going to stand here and tell you again, that has not occurred in this case. It hasn't occurred through the . . . Police Department. It hasn't occurred through us.

Assuming *arguendo* that these statements constituted an improper jury argument because prosecutors may not "assert [their] own credibility as a foundation for that of [their] witnesses,"[61] we nevertheless conclude that Adams has not made a substantial showing that would overcome the presumption of reasonable assistance.[62] Adams has neither made a sufficient showing that there is a reasonable probability that the trial's result would have been different if Pickett had objected nor that the state court erred in concluding that Pickett made a strategic choice not to object. Pickett "could have decided that his best strategy was to let his own closing argument . . . speak for itself. Whatever the reason for his choice not to object, we do not view his conduct as ineffective assistance."[63] The state courts' holdings that Adams did not suffer IAC from

---

[61] *See United States v. Garza*, 608 F.2d 659, 664 (5th Cir. 1979).

[62] We do not reach the issue of whether the State's argument was in fact improper under Texas law. The state habeas court found, as a matter of state law, that the argument did not give rise to an objection. *See Engle v. Isaac*, 456 U.S. 107, 119–21 (1982) (indicating that reviewing questions of state law is not a component of our habeas review).

[63] *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992).

Pickett's failure to object were not unreasonable. We shall not grant Adams a COA on this claim.

## C. COA Issue Two: Due Process – Failure to Reveal Impeachment Evidence

Adams contends that the State unconstitutionally withheld *Brady* material from him by failing to disclose information concerning an offer made to State witness Llewelyn Mosley in exchange for his testimony. According to Adams, the State (1) may have offered Mosley a deal for his testimony even though no specific consideration was ultimately agreed upon and (2) assured Mosley that he was not a suspect in Vick's murder and that the State would have already charged him if he were a suspect. Mosley testified against both Wright and Adams at their respective trials.

The suppression of impeachment evidence that is material to guilt or punishment violates due process.[64] "Evidence is 'material' when its suppression creates a reasonable probability of a different result."[65] We consider cumulatively the materiality of all suppressed evidence.[66]

In Wright's appeal, we said that he had offered no reason to disturb the district court's determination that he failed to establish that the State had suppressed evidence of an agreement not to prosecute Mosley.[67] Likewise, Adams has failed to offer any justification to reconsider the existence of an *actual agreement* not to prosecute.

---

[64] *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006).

[65] *Id.*

[66] *Id.* There is no harmless-error inquiry in our *Brady* analysis. *Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006).

[67] *Wright*, 470 F.3d at 591–92.

Adams, however, asserts a distinct argument — that the State had a duty to disclose the mere "possibility of a reward," irrespective whether an actual agreement existed.[68] The State has a duty to disclose a possibility of reward because even a possibility gives a witness "a direct, personal stake" in the defendant's conviction, regardless whether "the stake was . . . guaranteed through a promise or binding contract, [or] was expressly contingent on the Government's satisfaction with the end result."[69] To hold that the State need only reveal inducements to testify if the prospective witness responds "I accept" would permit the State to conceal evidence of agreements that in practice might have been accepted by the witness's act of actually testifying rather than by signing or otherwise reaching an explicit agreement.

At trial, but outside the jury's presence, Mosley's attorney, Kent Traylor, testified that Mosley and the State had reached no implied or express agreement. Yet, Traylor did refer to an "offer." The lead prosecutor and one of his colleagues have stated under oath, however, that they made no offer to Mosley to secure his testimony. And, the state habeas court found credible prosecutor Rick Jordan's recollection that he offered Mosley no deal and that "there was no need whatsoever to offer any deal to Mosley because he had been unreservedly telling the same story to the police and prosecution team since he was first questioned . . . a few days after" the murder. The state habeas court rejected Adams's claim and determined "that the record, including Traylor's testimony and the affidavits of [the two prosecutors], does not reflect that the State made an offer to Mosley, but merely reflects — through Traylor's brief testimony — that there was some 'offer' discussed by Traylor and Mosley. . . . Traylor's testimony may merely have described an 'offer' that Traylor and

---

[68] *See United States v. Bagley*, 473 U.S. 667, 683–84 (1985) (Blackmun, J., joined by O'Connor, J.).

[69] *Id.* at 683.

Mosley made or discussed making to the State." In denying relief to Adams, the TCCA adopted the state habeas court's findings.

Adams has not established that the district court's denial of Adams's *Brady* claim is reasonably debatable. He offers nothing to upend the state habeas court's factual determination that no offer was made. Traylor's bare mention of the word "offer" in the face of credible testimony that the State made no offer to Mosley is insufficient to support a *Brady* claim.[70] We shall not grant Adams a COA on this claim.[71]

## D.     COA Issue Three:  Exclusion of a Member of the Venire

No defendant may constitutionally be put to death by a jury "chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."[72] Neither may a trial court exclude any member of the venire who is "willing to consider all of the penalties provided by state law, and [is] not . . . irrevocably committed, before trial has begun, to vote against the penalty of death regardless of the facts and circumstances" of the case.[73] Further, "a juror may not be challenged for cause based on his views about capital punishment

---

[70] *Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (per curiam) (stating that "speculation about the suppression of exculpatory evidence" cannot support a *Brady* claim).

[71] Although the TCCA unanimously rejected Adams's state habeas application, we recognize that, on Adams's direct appeal, two TCCA justices would have reversed the trial court on the issue of the State's allegedly withheld offer to Mosley. *See Adams v. State*, No. 73,132 (Tex. Crim. App. Nov. 22, 2000) (unpublished) (Womack, J., dissenting). The dissent focuses on the fact that a possibility of reward can be material. Yet, at that time, the TCCA neither had the benefit of (1) the state habeas evidence, including the prosecutors' affidavits, nor (2) the state habeas court's factual findings and conclusions of law, which the TCCA subsequently adopted in toto. The dissenting opinion in Adams's *direct appeal* thus does not convince us that reasonable jurists could debate the district court's disposition of his *habeas* application.

[72] *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).

[73] *Id.* at 522–23 n.21.

unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[74] "A trial judge's finding of bias during voir dire is a determination of fact, subject to a presumption of correctness on collateral review . . . ."[75]

In the instant case, the trial judge excluded a member of the venire who stated that she personally could never vote for the death penalty despite its being proper and appropriate in some cases. The prospective juror clarified her views during voir dire examination, and when she was asked whether she could vote for the death penalty in the worst of imaginable cases, she indicated that she could not. Given this testimony and the presumption of correctness of such a determination by a trial court, Adams has failed to make a substantial showing that excluding this member of the venire violated Adams's constitutional rights. We shall not grant Adams a COA on this claim.

## IV. CONCLUSION

We affirm the district court's grant of habeas relief on the ground that Adams was prejudiced by his trial counsel's deficient mitigation investigation constituting constitutionally deficient assistance of counsel. We deny a COA on Adams's other claims, however, because he has failed to make a substantial showing of the denial of any other constitutional right.

AFFIRMED.

---

[74] *Adams v. Texas*, 448 U.S. 38, 45 (1980).

[75] *Fuller v. Johnson*, 114 F.3d 491, 500–01 (5th Cir. 1997).