******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBERT BRETON *v.* COMMISSIONER
OF CORRECTION
(SC 19072)

Rogers, C. J., and Palmer, Eveleigh, McDonald and Robinson, Js.*

*Argued October 21, 2016—officially released May 23, 2017*

*Victoria L. Steinberg*, pro hac vice, with whom were *Moira L. Buckley* and, on the brief, *William H. Kettlewell*, pro hac vice, and *Jason A. Casey*, pro hac vice, for the appellant (petitioner).

*Harry Weller*, senior assistant state's attorney, with whom were *Cynthia S. Serafini*, senior assistant state's attorney, and, on the brief, *Maureen Platt*, state's attorney, and *Michael Proto* and *Marcia Pillsbury*, assistant state's attorneys, for the appellee (respondent).

*Opinion*

McDONALD, J. The petitioner, Robert Breton, was found guilty of two counts of murder and one count of capital felony for the 1987 stabbing deaths of his former wife and his son, and was sentenced to death.[1] The petitioner thereafter filed a petition for a writ of habeas corpus, attacking both his conviction and his death sentence. This appeal ensued after the habeas court denied the petition. Subsequent events have rendered the petitioner's claims relating to his death sentence moot; see part II of this opinion; leaving for our consideration those challenging the judgment of conviction.

The principal issue in those remaining claims concerns defense counsel's obligation to investigate and present mitigating evidence that could reduce a defendant's culpability when the defendant has directed counsel not to present such evidence and has refused to aid in the presentation of such evidence. The petitioner claims, among other things, that his criminal trial counsel provided deficient representation by failing to investigate evidence that would have revealed that he suffered from post-traumatic stress disorder (PTSD) and methamphetamine intoxication at the time of the offenses, which in turn prejudiced him by depriving him of a meritorious mitigating defense strategy. Specifically, the petitioner points to counsel's failure to: (1) discover transcripts memorializing the petitioner's account of fatally stabbing his father in 1966; and (2) test the petitioner's blood sample drawn approximately forty hours after the crimes. The petitioner contends that, contrary to the habeas court's conclusions, his refusal to admit to the 1987 crimes and his instruction to counsel not to present an extreme emotional disturbance defense does not preclude relief because counsel had not adequately advised him of the evidence that was available due to their deficient investigation and they should not have acquiesced to the petitioner's uninformed decision.

We conclude that counsel must ensure that a defendant has made a knowing and voluntary decision not to present mitigating evidence. We further conclude that the habeas court properly denied the petition in the present case as to the claims related to this issue, as well as to the petitioner's other claims challenging his conviction.

I

CRIMINAL TRIAL

The underlying criminal proceedings were the subject of three previous appeals to this court. See *State* v. *Breton*, 212 Conn. 258, 259, 562 A.2d 1060 (1989) (*Breton I*) (reversing trial court's decision dismissing aggravating factor of capital felony and remanding case with direction to proceed with penalty phase); *State* v. *Breton*, 235 Conn. 206, 260, 663 A.2d 1026 (1995) (*Breton*

*II*) (affirming judgment of conviction but reversing judgment imposing death sentence—first penalty phase—and remanding for new penalty phase hearing); *State v. Breton*, 264 Conn. 327, 446, 824 A.2d 778 (*Breton III*) (affirming judgment imposing death sentence in second penalty phase), cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003). In *Breton II*, supra, 212–14, this court set forth the facts that the jury reasonably could have found at the guilt phase of the proceedings in support of the conviction. We briefly summarize the most salient of those facts, and supplement them with undisputed facts in the record regarding the circumstances leading to the present appeal.

Sometime before 4:30 a.m. on Sunday, December 13, 1987, the petitioner entered the town house apartment where his former wife, JoAnn Breton, and their fifteen year old son, Robert Breton, Jr., had resided since the couple's divorce in January, 1987. The petitioner was armed with a knife. He proceeded to JoAnn Breton's bedroom, where he viciously beat and stabbed her. Robert, Jr., came to the bedroom in response to his mother's cries, but fled when the petitioner turned the attack on him. The petitioner pursued Robert, Jr., to the bottom of the staircase on the first floor, where the attack resumed. Both Robert, Jr., and JoAnn Breton sustained multiple knife wounds to the face, chest and neck. Each bled to death from a knife wound severing the carotid artery.

The petitioner left the apartment and, at some point thereafter, drove to a nearby reservoir. Later Sunday morning, he called someone to pick him up at the reservoir because his truck had gotten stuck. Sunday evening, he went to work. He made arrangements with Domenic Aurigemma, a friend and coworker, to retrieve the truck the next day. When the men met on Monday morning, December 14, the petitioner asked Aurigemma to first drive him over to JoAnn Breton's apartment because he had repeatedly gotten a busy signal when he telephoned her over the weekend. Upon their arrival, the petitioner went to the apartment door but then returned to alert Aurigemma that he thought that there was blood on the doorknob. They then called the police.

After the police arrived, obtained entry to the apartment, and discovered the bodies, they interviewed the petitioner. They noticed that the petitioner's hand was bandaged, with blood around the wound. An investigation that same day yielded evidence inculpating the petitioner. One witness reported hearing screams and then seeing the petitioner leave the apartment at approximately 4:30 a.m. on December 13. That same witness also reported having been told by Robert, Jr., that the petitioner had threatened to kill JoAnn Breton. The petitioner was arrested at approximately 8 p.m. on Monday, December 14, 1987. A search warrant executed at the petitioner's apartment yielded a pair of recently

washed sneakers, still wet, that matched bloody foot-prints in the apartment. At approximately 9 p.m. on December 14, the police executed a search warrant that compelled the petitioner to submit to the drawing of a blood sample. The state never tested that blood sample to match it to blood at the scene. Instead, a second sample was drawn and tested by the state in March, 1989, by agreement of the parties, after defense counsel moved to suppress the first sample on the ground that the warrant affidavit contained false statements attributed to the petitioner.

Approximately one month before jury selection was to commence, defense counsel requested that the court order a competency evaluation of the petitioner due to concerns arising from their conversations with him. The trial court, *Heiman, J.*, ordered an independent evaluation by a team of clinicians, who later reported to the court that the petitioner understood the proceedings against him and was able to assist in his defense.

While jury selection was in progress, defense counsel raised further concerns to the court when responding to the deadline for giving notice as to whether they would be presenting any expert testimony during the guilt phase in support of defenses relating to the petitioner's mental state. See Practice Book § 40-18. Counsel informed the court that they believed that there was important evidence related to the petitioner's mental state that could provide the jury with a basis to convict the petitioner of the lesser offense of manslaughter. Nevertheless, the petitioner had told counsel that he did not want them to present a defense of extreme emotional disturbance.[2] Counsel explained that they believed that they must acquiesce to the petitioner's wishes but asked the court to confirm the petitioner's position. The trial court then engaged in a colloquy with the petitioner to confirm that he understood that evidence of extreme emotional disturbance could reduce his culpability from murder to manslaughter, but that he had nonetheless instructed his counsel not to file "any notices of claims of extreme emotional disturbance" and, additionally, that he had instructed them not to produce "any psychiatric evidence" at the guilt phase of trial. After receiving that confirmation, the court found the petitioner competent to make this decision. The court informed the petitioner that such a defense still might be presented if he later changed his mind. The court also informed the petitioner that his wishes did not foreclose the possibility that the court could charge the jury on extreme emotional disturbance if the evidence warranted such an instruction. The state's attorney confirmed on the record his understanding that defense counsel had not precluded the presentation of expert testimony relating to the petitioner's mental condition at the penalty phase.

During the guilt phase of trial, the defense solely

advanced a theory of reasonable doubt. Counsel cross-examined the state's witnesses in an effort to call into question the credibility of the eyewitness identification and the physical evidence linking the petitioner to the crime scene. In their case, defense counsel presented only three witnesses. The testimony of those witnesses was intended to establish that the petitioner had cut his hand at work, many hours after the crimes.

Before the defense rested, counsel asked, outside the presence of the jury, for certain matters to be placed on the record. First, defense counsel notified the court that the petitioner had elected not to testify. The court confirmed with the petitioner that he understood that he had the right to testify, but did not want to do so. Second, defense counsel expressed their concern that, despite repeated discussions with the petitioner, most recently that same day, he had refused to accept their advice to allow them to present an affirmative defense in mitigation. They asked the court to confirm the petitioner's decision. Before eliciting any statements from the petitioner, the court explained that it had no knowledge of the substance of the petitioner's discussions with counsel and was not seeking such information, as the court should not be privy to such matters. The court then explained to the petitioner that the presentation of certain evidence could result in a conviction of a lesser degree of homicide and urged him to give serious consideration to counsel's advice, pointing out that the court's previous denial of defense counsel's motion for a judgment of acquittal meant that there was sufficient evidence to present the capital felony and murder counts to the jury. The court took a short recess to afford the petitioner an opportunity to consult with counsel. When court reconvened, the petitioner confirmed that he had had a chance to discuss all aspects of the case with counsel, and counsel confirmed that the defense had no further evidence to present. After the state rested, the court gave a charge to the jury that included an instruction that, if it found that the petitioner had acted under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse, it could find the petitioner guilty of manslaughter in the first degree instead of murder. The jury returned a verdict of guilty of murder and capital felony.

The first penalty phase proceeded before the same jury approximately five months later, at which time defense counsel presented evidence of mitigating factors. Mitigating factors also were presented at the second penalty phase hearings heard by a three judge panel eight years later, following this court's reversal of the judgment imposing the death sentence in the first penalty phase. The primary evidence came from two expert witnesses, Walter Borden, a psychiatrist who had conducted a forensic psychiatric evaluation of the petitioner, and Anne Phillips, a clinical psychologist who

had administered a battery of psychological tests to the petitioner. Borden and Phillips both diagnosed the petitioner as suffering from a severe mixed personality disorder with borderline schizoid, paranoid, and depressive features. Both experts opined that, at the time of the offenses, the petitioner suffered from extreme emotional disturbance and his mental capacity was significantly impaired.

Borden's testimony was of particular significance. He had interviewed the petitioner on four occasions, beginning just two months after his arrest, in February, 1988, and ending in December, 1988. Borden also elicited background information from certain members of the petitioner's family, and reviewed psychological reports and certain public records pertaining to the petitioner. Those records included a presentence investigation report relating to the petitioner's conviction of manslaughter for killing his father twenty-one years before the petitioner killed his former wife and his son.

Borden testified that the petitioner's early childhood and adolescence were replete with horrific neglect, abuse and abandonment—some of the worst Borden had ever encountered—that had significantly affected the petitioner psychologically. Borden described those circumstances at length, which this court recounted in *Breton III*, supra, 264 Conn. 340–42, 371–72. He described the petitioner's father as a heavy drinker who was abusive and threatening toward the petitioner and others, and who routinely carried a knife. Id., 342.

Borden recounted the following information that he had elicited regarding the two events that are relevant to the petition presently before us, which we memorialized in *Breton III*: "On December 3, 1966, the [petitioner's] father left the house to go drinking. It was later reported that, while out drinking, the [petitioner's] father stated that the time had come to kill the [petitioner, who was then nineteen years old]. The [petitioner] was at home with his grandmother, who had just prepared a meal for them to eat, when the [petitioner's] father came in, threatened the [petitioner], pushed the kitchen table against him and threw him up against the wall. The [petitioner] retreated into the bathroom to escape from his father and told his grandmother to call the police. The [petitioner's] father then attacked [the] grandmother.

"The [petitioner's] memory about what happened next was not clear. Borden testified that the [petitioner] told him that he remembered picking up a knife and seeing his father fall, apparently hurt. The [petitioner] did not remember stabbing him, however. The [petitioner] then ran out of the house, found a police officer to whom he indicated that his father had been hurt and brought the officer back to the house. The [petitioner's] father died of multiple stab wounds to the chest and face. Ultimately, the [petitioner] confessed to the kill-

ing. He pleaded guilty to manslaughter and received a suspended sentence. Borden testified that the [petitioner] told him that he did not clearly recall stabbing his father, but admitted that he must have done so.

"Shortly after the [petitioner] killed his father, he met his wife, JoAnn Breton. He married her in December, 1967, within a few days of the first anniversary of his father's death. The [petitioner] was very dependent on his wife for stability and psychological support, but their marriage was stormy. Borden testified that the [petitioner] was pathologically jealous of other men, paranoid and delusional, and that these conditions derived from a belief that he could not be loved and from a profound distrust of other people." (Footnotes omitted.) Id., 342–43.

"When the [petitioner] was laid off [from his job in 1985], he became depressed and started drinking heavily and taking pills. The relationship between him and his wife worsened. . . . Divorce proceedings were initiated in July, 1986, and were finalized in January, 1987.

"During this period the [petitioner] continued to become more depressed and to drink heavily. He also took the prescription drugs Desoxyn and Fiorinal. Desoxyn is an amphetamine with a potent stimulant effect. Borden testified that it was the worst medication that could have been prescribed for the [petitioner] because it would have exacerbated his depression and paranoia and could trigger violent behavior. He also testified that using the drug in combination with alcohol would be 'like throwing gasoline' on a simmering fire.

"Borden testified that the [petitioner] reported to him that he was extremely depressed during the month of December, 1987. His birthday, the anniversary of his father's death and his wedding anniversary all occurred in that month. It would have been his twentieth wedding anniversary that year. [He felt abandoned by the fact that his former wife and his son were planning to leave for Florida on December 17, and would be away for Christmas.] . . .

"On December 12, 1987, the [petitioner] went to his former wife's house in connection with one of [the various] tasks [that he had recently undertaken in the hopes of reconciling with her]. While there, he took her keys. That evening, the [petitioner] went to a bar. He met a woman there . . . and took her back to his house, where he attempted unsuccessfully to have sexual intercourse with her. At some point, he took the woman home and then returned to his own house. He then noticed the keys that he had taken from his former wife's house and decided to return them to her and to try to talk to her. By then, it was very early in the morning of December 13.

"Borden testified that his understanding of the events that happened next was based on [his first] interview

with the [petitioner] on February 20, 1988.[3] The [petitioner] told him that, as he parked the car in the parking lot [at] his former wife's house, he thought that he saw someone walking around [outside].[4] He then 'strapped on' a knife, went to the door and let himself in with the keys. [The petitioner was wearing gloves.] The [petitioner] reported to Borden that, at that time, he felt nervous, scared and unsure of himself. He laid the keys on an ironing board and then returned to the door, intending to leave. Instead, he went down into the basement. He did not know why. At some point, he went back up to the first floor and stood for a while. He then decided to go upstairs to his former wife's bedroom. The [petitioner] reported to Borden that he still did not understand what he was doing. The [petitioner] entered his former wife's bedroom, knelt on the bed and grabbed her. She screamed. The [petitioner] reported to Borden that he just wanted to talk to her at that point, but was unable to speak. His former wife then yelled, 'Bobby, call the cops, somebody is hurting me.'

"Borden testified that, at this point in the narrative . . . the [petitioner's] demeanor changed dramatically. He began crying, sweating and trembling. In this agitated state, the [petitioner] reported to Borden that he had been trying to keep his former wife from yelling, not trying to hurt her. He recalled pushing her face down, wrestling on the bed with her and falling onto the floor. He found himself sitting on top of her and hitting her to keep her from yelling. She continued to scream to 'Bobby' that someone was trying to rape her.

"At some point a light went on in the hall next to the bedroom. When the [petitioner] looked up he saw someone standing in the doorway. The [petitioner] did not know who it was. At that point, the [petitioner] took the knife in his hand. Borden testified that the [petitioner's] description of his feelings at that time were 'very similar [to those that he had described having at the time of] the death of his father where he described himself recalling, seeing the hand, his hand and the knife, not knowing what happened. . . . [I]t's like he didn't feel like he took the knife, he felt like his hand did it. It was a dissociative, it was not part of him.'

"The [petitioner] reported to Borden that he did not recognize the person in the doorway. He said to his former wife that it was not 'Bobby,' but she said that it was. The person in the doorway then said something to the [petitioner]. The [petitioner] reported to Borden that he believed that the words were, 'Dad, I love you.' At that point, the [petitioner] saw his own arm go out and hit the person in the doorway. He could not clearly see the person he was striking because the light was behind that person.

"Borden testified that, during this part of the [petitioner's] narrative to him, the [petitioner] was extremely emotional, trembling and crying and appeared to be

racked and tormented by his recollection. Borden testified that it was his impression that the [petitioner] was 'back in that room' as he reported the events. The [petitioner] reported that he hit the person in the doorway and saw something gushing out of his neck or head and heard something gasping and gurgling. At that point, the [petitioner] recognized his son.

"The [petitioner] then heard his former wife calling him and he returned to the bedroom. She asked the [petitioner], '[W]hy, Bob?' The [petitioner] then grabbed her hair and felt his hand hit her. He heard gurgling and then a crash. He left the bedroom and, as he started down the stairs, saw his son lying at the bottom of the stairs on the floor, shaking. At that point, he went back into the bedroom and knelt next to his former wife, who was lying on the floor and asked, '[W]hy, why.' He told her that he just wanted to talk, but then he hit her with his hand again.

"Borden testified that, at this point in the interview, the [petitioner] said, in reference to what happened next, 'God, no, no, no, I didn't do that.' The [petitioner] reported that he left the bedroom and went back downstairs. His son was lying dead at the bottom of the stairs with his eyes open and looking at the [petitioner]. The [petitioner] said to his son, '[T]hank you for the birthday card,' and then stabbed him in the neck.[5]

"Borden testified that, while the [petitioner] was reporting this portion of the narrative, he was saying, '[W]hy do I remember so much? Why do I have to remember?' and '[W]hy, why, why.' He also continued to cry and to be in an extreme emotional state. After describing his last act, however, his demeanor changed instantaneously, as if he had awoken from a nightmare. Borden testified that he could never persuade the [petitioner] to talk about the events surrounding the murders again. . . .

"Borden testified that the [petitioner's] experience of his hand as not being a part of himself was an example of the depersonalization that borderline personalities are prone to experience. Borden also testified that depersonalization is a defense mechanism developed by children who have been subjected to chronic severe abuse. As adults, such persons are prone to go into a dissociative state under severe stress.

"Borden testified that, in his opinion, at the time of the offense, the [petitioner's] ability to conform his conduct to the requirements of the law was significantly impaired; his mental functioning was significantly impaired; he suffered from a mental disease or defect, namely borderline personality disorder; and he was severely mentally ill. He also testified that the [petitioner] suffered from an extreme emotional disturbance at the time of the offense." (Footnotes added.) Id., 344–49.

The three judge panel before which the second penalty phrase was heard made findings consistent with those found by the jury in the first penalty phase. The panel found that the state had proved beyond a reasonable doubt that the murders had been committed in an especially cruel manner. Id., 335–36. The panel found that the petitioner had not proved that he suffered from an extreme emotional disturbance, but had proved other mitigating facts, including that he was neglected, abandoned and the product of an abusive family unit during his childhood. Id., 336 and n.8. The panel concluded that none of the proven mitigating facts alone or in combination constituted mitigation. Id., 336. In accordance with its findings, the panel imposed a sentence of death. Id. The petitioner directly appealed from the judgment imposing this sentence to this court. Id.

While the appeal in *Breton III* was pending, the petitioner filed a petition for a new trial, claiming that two transcripts of the petitioner's account of the 1966 killing of his father, which came to light for the first time during the state's cross-examination of Borden at the second penalty phase hearing, constituted newly discovered evidence. One transcript was from a police interview conducted hours after the crime; the other was from the coroner's inquest. The petition alleged that the transcripts would have led to a different outcome because the petitioner's dissociated mental state reflected in the 1966 transcripts would have led Borden to diagnose the petitioner as having a significant dissociated mental state at the time of the 1987 homicides that could have rendered him legally insane. This court continued the appeal in *Breton III* to allow that petition to proceed, after the petitioner argued that a hearing on the petition would provide a crucial factual underpinning for a related claim in the appeal. Id., 354. New trial counsel ultimately withdrew that petition with prejudice, following Borden's clarification that further testing would be necessary to determine whether the petitioner was legally insane at the time of the offense.[6] Id. The appeal in *Breton III* proceeded, and this court affirmed the judgment imposing a sentence of death on the petitioner. Id., 446.

## II

### HABEAS TRIAL

Some prefatory comments are necessary to explain the scope of our review of the habeas proceedings. After his judgment of conviction and sentence became final, the petitioner filed an amended petition for a writ of habeas corpus, claiming that constitutional errors had infected every stage of the criminal proceedings— guilt phase, second penalty phase, petition for a new trial, and appeal. The habeas court, *Schuman, J.*, denied the petition. The petitioner appealed from that judgment to the Appellate Court, and then moved to transfer

the appeal to this court.

Following our grant of the motion to transfer, we issued our decision in *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015), which effectively narrowed the issues that we must consider in the petitioner's present habeas appeal. In *Santiago*, this court held that, in light of the 2012 public act prospectively repealing the death penalty; Public Acts 2012, No. 12-5; the execution of offenders who committed capital felonies prior to the act's effective date would violate the state constitution's prohibition against cruel and unusual punishment. *State* v. *Santiago*, supra, 8–9. The parties in the present case agreed at oral argument before this court that *Santiago* rendered all of the petitioner's claims challenging his sentence of death moot, as the petitioner is now entitled to seek to have his sentence corrected to life imprisonment without the possibility of release. Therefore, the discussion of the habeas proceedings that follows is limited to the petitioner's claims that relate to the judgment of conviction.

In the operative petition, the petitioner asserted the following claims that are relevant to the present appeal. First, he alleged guilt phase counsel rendered ineffective assistance by: (a) failing to discover the two 1966 transcripts, which could have ultimately established that the petitioner suffered from PTSD with dissociative features during the 1987 crimes; (b) failing to test the blood sample taken from the petitioner approximately forty hours after the 1987 crimes (first blood sample), which had remained in the state's file until discovered by habeas counsel, and which could have established that he suffered from methamphetamine (Desoxyn) intoxication during the commission of the offenses; and (c) presenting a marginal reasonable doubt defense to the exclusion of a meritorious extreme emotional disturbance defense. Second, he alleged that he had received ineffective assistance of counsel in his petition for a new trial because counsel had withdrawn the meritorious petition with prejudice. Third, the petitioner alleged that the cumulative effect of counsel's deficient performance regarding the aforementioned matters constituted the prejudice necessary to establish ineffective assistance of counsel, as well as a violation of his right to due process. Fourth, the petitioner alleged that the state's failure to disclose the 1966 transcripts constituted the suppression of material, exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Hearings on the habeas petition took place in 2011—twenty-four years after criminal trial counsel was appointed, and twenty-two years after the guilt phase of the criminal trial concluded.[7] Although we explore the details of this evidence in part III of this opinion in our analysis of the petitioner's specific claims, we briefly summarize that evidence to provide context for

the habeas court's decision.

The petitioner proffered testimony from Alan McWhirter and Richard F. Kelly, who represented the petitioner at the guilt phase and the first penalty phase, as well as from the other attorneys whose performance at other stages of the criminal proceedings was alleged to be deficient. McWhirter and Kelly had little recall of the details of their communications with the petitioner and their investigatory strategies due to the exceptionally long time that had lapsed since they represented the petitioner. Defense counsel clearly recalled, however, that the petitioner had consistently taken the position that he did not commit the crimes and had consistently refused to allow them to present any defense that would be tantamount to an admission that he had done so. They acknowledged that they had believed all along that a reasonable doubt defense had little chance of success. Nonetheless they pursued that strategy because (1) they believed that the petitioner had the right to decide whether to effectively admit that he had committed manslaughter, and (2) the petitioner had suggested that he would take the stand to deny having committed the crimes if counsel put on evidence suggesting that he had done so. Defense counsel did not believe that they had specifically discussed PTSD with the petitioner, but they recalled discussing the petitioner's drug and alcohol abuse. McWhirter testified that defense counsel had recognized that intoxication "would possibly be a defense we could raise depending on whether it was intention[al], unintentional, or whatever. Obviously it never got raised because [the petitioner] would not let us go in that direction."

The petitioner also proffered documentary evidence and expert witnesses. The petitioner presented expert opinion that the 1966 transcripts would have provided significant evidence that the petitioner was in a dissociative state when he killed his father, which was reflective of PTSD resulting from prior childhood trauma. The experts further opined that this evidence, in combination with the petitioner's account of the 1987 crimes to Borden and subsequent interviews or testing, demonstrated that he suffered from PTSD with dissociative features during the commission of the 1987 crimes.

The petitioner also presented expert testimony extrapolating, on the basis of the level of methamphetamine detected when habeas counsel tested the first blood sample in 2005: (a) a range of the level of the drug in the petitioner's system when the blood was drawn in 1987; and (b) from that range, a range of the level of the drug in his system forty hours earlier when he committed the crimes. The petitioner presented expert opinion that levels in this range would have caused the petitioner to suffer methamphetamine intoxication.[8] One of the petitioner's experts, Neil Blumberg,

a psychiatrist, opined that the petitioner had six mental disorders at the time of the crimes—chronic PTSD, depressive disorder not otherwise specified, amphetamine intoxication, amphetamine abuse, alcohol dependence, and personality disorder not otherwise specified with borderline features—that collectively had caused an extreme emotional disturbance. Another expert, Pablo Stewart, a psychiatrist, opined that the exacerbating effect of methamphetamine intoxication on preexisting PTSD or the methamphetamine intoxication alone had caused an extreme emotional disturbance at the time of the crimes.

Finally, the petitioner presented testimony from an experienced capital defense attorney that competent counsel defending such cases would have investigated these matters. This expert opined that counsel should not acquiesce to a defendant's wishes whether to present such evidence, and should make continuous efforts to persuade a defendant to present such evidence.

The respondent, the Commissioner of Correction, proffered numerous exhibits relating to defense counsel's investigation and presented his own toxicology experts on methamphetamine intoxication. Those experts opined that, because of various factors, a single, eighteen year old blood sample could not yield evidence to reliably establish a level of methamphetamine in a person's system forty hours before it had been drawn. The respondent did not offer any experts on PTSD, but he cross-examined the petitioner's experts as to the foundation of their opinions.

Notably, the petitioner did not testify at the habeas trial. Indeed, his habeas experts testified that the petitioner still maintained that he did not commit the crimes and would become so angry and defensive if any attempt was made to probe into that matter that they were forced to rely on his lone account of the crimes to Borden to make a diagnosis. The petitioner also did not offer Borden or Phillips as habeas witnesses to explain whether the transcripts or blood test would have affected their opinions.

The habeas court determined that counsel had rendered deficient performance in two respects, but that neither deficiency had prejudiced the petitioner in light of the position he had taken regarding his defense. The court deemed McWhirter and Kelly to have performed deficiently for failing to discover the 1966 transcripts containing the petitioner's firsthand account of his father's death. The court found that although defense counsel first became aware of the transcripts when the state's attorney raised them while cross-examining Borden at the second penalty phase, the transcripts had been available to counsel in materials set aside as relevant to the 1987 crimes in the state's attorney's office. As to the significance of this evidence, the court agreed with defense counsel's assessment that the prior

homicide was in part a " 'wild card,' " insofar as the prosecution could benefit from evidence that the petitioner had previously killed someone. The court found that the balance weighed in favor of full investigation, however, because the crimes had substantial similarities (irrationally slaying an immediate family member), and the circumstances of the 1966 crime (suspended sentence and probation on a charge of manslaughter) suggested a bona fide defense.

Nonetheless, the court determined that the petitioner had not established prejudice because there was not a reasonable probability that the result would have been different had this evidence been available. The court found that "the petitioner was a difficult and oppositional client who maintained, despite strong evidence to the contrary, that he did not commit the killings. Although first trial counsel thought their best defense was extreme emotional disturbance, because it would reduce murder to manslaughter and thereby eliminate a possible death sentence, for this defense to succeed the petitioner would have to acknowledge his actions in causing the victims' deaths. The petitioner would not make that acknowledgment." (Footnote omitted.) Not only that, but the petitioner had specifically forbidden counsel to assert a defense on this basis.

The court noted that criminal trial counsel had repeatedly attempted to change the petitioner's mind, and that attempting to override his decision was risky as a general proposition and particularly so in the present case. The court noted that it would be difficult to present the defense without the petitioner's testimony admitting to the killings. There was nothing that would indicate that the petitioner would be willing to do so, whereas counsel had expressed a legitimate concern that the petitioner would take the stand and deny the killings. That action might not only negate the extreme emotional disturbance defense, but also would allow the state to impeach the petitioner with his prior admission to Borden. As such, the court reasoned that overriding the petitioner's decision might not only doom the effect of the evidence at the guilt phase, but also negatively impact the jurors' perceptions for purposes of the penalty phase.

The habeas court also found counsel deficient for failing to test the blood sample for evidence of intoxication. The court could perceive of no strategic reason not to test the sample given the petitioner's drug abuse and the possibility that drug use could support a claim of intoxication or be a mitigating factor at the penalty phase, and counsel had provided none. The court agreed with the petitioner that a blood test for drugs is the " 'gold standard.' "

Nonetheless, the court found that the petitioner was not prejudiced by counsel's failure to test the sample because he would not have permitted counsel to proffer

that evidence. The court reasoned: "At the guilt phase, the assertion of intoxication evidence essentially represented a concession by the petitioner that, although he was intoxicated at the time, he nonetheless committed the killings. . . . The court credits the testimony of McWhirter that the petitioner refused to allow first trial counsel to take this approach. Drug testing . . . would not likely have changed the petitioner's mind; the petitioner knew that his attorneys had abundant nonscientific evidence of the petitioner's drug and alcohol abuse, yet he still opposed presenting evidence of intoxication." In its discussion of the penalty phase, the court also found that the petitioner's habeas experts had not established that the petitioner took an intoxicating dose at the critical time before the murders, but rather had relied on one uncertainty after another.

In light of its resolution of the aforementioned claims, the habeas court summarily rejected the petitioner's remaining claims of ineffective assistance of guilt phase counsel, a *Brady* violation, and cumulative error. The court deemed the petitioner's stand regarding his unwillingness to admit to the killings to preclude a claim that counsel was ineffective for presenting a marginal reasonable doubt defense to the exclusion of a meritorious extreme emotional disturbance defense. The court concluded that the state had not suppressed the 1966 transcripts, but even if it had, the petitioner's *Brady* claim would fail because the materiality standard set forth in *Brady* is the same as the prejudice component of the ineffective assistance of counsel standard. As to cumulative error, whether framed as ineffective assistance of counsel or due process, the habeas court concluded that such a claim is not cognizable under Connecticut appellate case law.

Finally, the court rejected the petitioner's claim that he had received ineffective assistance of counsel in connection with his petition for a new trial.[9] The court concluded that, because there is no statutory or constitutional right to counsel in connection with a petition for a new trial, the petitioner had no right to effective assistance of counsel. Accordingly, the habeas court denied the petitioner's amended petition for a writ of habeas corpus. This appeal followed.

III

APPEAL

The petitioner challenges the habeas court's factual finding that he rejected the presentation of evidence of intoxication and the court's legal conclusions as to all of his claims. In reviewing these claims, we are mindful that "[t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a

mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 775, 138 A.3d 908 (2016).

## A

### Ineffective Assistance of Counsel at the Guilt Phase

A fundamental premise of the petitioner's challenge to the habeas court's decision is that neither his statements rejecting a defense of extreme emotional disturbance nor his refusal to admit that he committed the crimes precludes relief. Citing *Wiggins* v. *Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), the petitioner contends that because guilt phase counsel failed to undertake a reasonable investigation, which would have uncovered the 1966 transcripts and included testing the blood sample, neither counsel nor the petitioner were able to make an informed strategic choice as to how to proceed. The petitioner asserts that his refusal to mount an extreme emotional disturbance defense was limited to the only theory that counsel *had* investigated and were prepared to present, namely, that he had a mixed personality disorder that caused him to be depressed and pathologically jealous. The petitioner contends that this defense simply described his state of mind, whereas a defense based on PTSD and intoxication would have explained the cause of his violent conduct. Finally, he contends that his testimony would not have been required to advance an extreme emotional disturbance defense, and even if he had insisted upon denying that he had committed the crimes, that action could have reinforced a defense based on an impaired mental state.

The respondent challenges the habeas court's conclusions that guilt phase counsel's performance was deficient with regard to either the transcripts or the blood sample. In addition to arguing that there were valid tactical reasons for defense counsel's inaction as to those two matters, the respondent argues that PTSD is simply a new diagnosis by new experts based on the same information on which the criminal trial experts based their opinions, which establishes neither deficient performance nor prejudice. The respondent defends the habeas court's determination that the petitioner's actions preclude him from establishing the prejudice necessary to obtain habeas relief. He further argues that *Schriro* v. *Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007), forecloses the petitioner's argument that his actions were immaterial in the absence of an informed, knowing and voluntary waiver of the specific evidence that he now claims should have been presented.

We limit our analysis to the question of prejudice, as that issue is dispositive. We conclude that a client's resolute, unambiguous instruction not to present miti-

gating evidence, if made knowingly and voluntarily, can preclude a showing of prejudice from counsel's failure to investigate mitigating evidence. We further conclude, largely for the reasons set forth by the habeas court, that this standard was met in the present case.

The petitioner's challenges to the effectiveness of counsel are governed by certain well settled principles. "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. [Id.] To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id., 694." (Internal quotation marks omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712–13, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against a petitioner on either ground. See id., 713; see also *Strickland* v. *Washington*, supra, 697 (court need not determine whether counsel's performance was deficient before examining prejudice suffered by defendant).

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* v. *Washington*, supra, 466 U.S. 690–91. Thus, in *Wiggins* v. *Smith*, supra, 539 U.S. 524–28, on which the petitioner relies, the United States Supreme Court held that although defense counsel was aware of certain aspects of the defendant's background, counsel's failure to compile a complete social history of the defendant was objectively unreasonable and, thus, counsel rendered deficient performance by failing to make a fully informed decision when deciding against presenting such mitigation evidence.

The Supreme Court has recognized, however, that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such informa-

tion." *Strickland* v. *Washington*, supra, 466 U.S. 691. Nonetheless, a defendant's refusal to *assist* in discovering certain evidence does not relieve counsel of his or her obligation to investigate and seek such evidence from other sources. See *Rompilla* v. *Beard*, 545 U.S. 374, 377, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (counsel's decision not to review court file of defendant's prior convictions that counsel knew prosecution would probably rely on as evidence of aggravation and that revealed mitigating evidence, was objectively unreasonable "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available").

Although the foregoing considerations are familiar to this court, we have not previously considered how these general principles apply when a defendant has refused to allow counsel to present mitigating evidence, and has even gone so far as to suggest that he would attempt to derail the presentation of such evidence if pressed. Other courts have confronted this situation, albeit principally in the context of the penalty phase of capital cases. Those courts have recognized that when a defendant instructs counsel not to investigate or present mitigating evidence, the scope of counsel's duty to investigate may be more limited. *Cummings* v. *Secretary for the Dept. of Corrections*, 588 F.3d 1331, 1358–59 (11th Cir. 2009), cert. denied sub nom. *Cummings-El* v. *McNeil*, 562 U.S. 872, 131 S. Ct. 173, 178 L. Ed. 2d 103 (2010); see also *Jeffries* v. *Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) ("[C]ounsel's acquiescence in [the defendant's] decision did not constitute deficient performance. Although the [A.B.A., Standards for Criminal Justice (2d Ed. 1980)] offers some support to [the defendant's] contention that his counsel should have presented evidence in mitigation despite his client's wishes to the contrary, [those standards] serve only as a guide for determining whether an attorney's performance is adequate." [Internal quotation marks omitted.]), cert. denied, 510 U.S. 1191, 114 S. Ct. 1294, 127 L. Ed. 2d 647 (1994). "This does not mean that a defendant's instructions as to investigation or presentation of mitigating evidence should be 'blindly followed' where the defendant has a possible mental impairment or the defendant's instructions are not explicit or are less than clear." *Cummings* v. *Secretary for the Dept. of Corrections*, supra, 1358. "The reason lawyers may not blindly follow such commands is that although the decision whether to use such evidence is for the client, the lawyer must first evaluate potential avenues and advise the client of those offering potential merit." (Internal quotation marks omitted.) *Adams* v. *Quarterman*, 324 Fed. Appx. 340, 347 (5th Cir. 2009).

"A competent defendant's clear instruction not to investigate or present mitigation evidence also impacts the prejudice prong of the ineffective assistance test." *Cummings* v. *Secretary for the Dept. of Corrections*,

supra, 588 F.3d 1359. In *Schriro* v. *Landrigan*, supra, 550 U.S. 469–70, the United States Supreme Court confronted a situation in which the defendant, Jeffrey Landrigan, had actively interfered with counsel's efforts to elicit mitigating evidence from two witnesses whose testimony defense counsel sought to present, Landrigan's former wife and his birth mother. Upon questioning by the trial court, Landrigan affirmed that he had instructed his counsel not to present " 'any' " mitigating evidence. Id., 469. At the conclusion of the sentencing hearing, when Landrigan was permitted to speak, he "made a brief statement that concluded, 'I think if you want to give me the death penalty, just bring it right on. I'm ready for it.' " Id., 470. Landrigan thereafter sought habeas relief on the ground that his counsel should have investigated the " 'biological component' " of his violent behavior resulting from his mother's use of drugs and alcohol while pregnant with him and from family history. Id., 471. A closely divided Supreme Court held that the defendant was not entitled to an evidentiary hearing on his claim of ineffective assistance because, in light of Landrigan's instruction and conduct, counsel's failure to investigate further could not have been prejudicial under *Strickland*. Id., 475.

The court explained that "[n]either *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court. *Wiggins* [v. *Smith*, supra, 539 U.S. 523] ('[w]e focus on whether the investigation supporting *counsel's* decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable' . . .). Indeed, we have never addressed a situation like this. In *Rompilla* v. *Beard*, [supra, 545 U.S. 381] . . . the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented." (Emphasis in original.) *Schriro* v. *Landrigan*, supra, 550 U.S. 478.

The majority rejected, in turn, the reasons cited by the United States Court of Appeals for the Ninth Circuit in support of its conclusion that Landrigan was entitled to an evidentiary hearing to establish ineffective assistance. The majority first rejected the Ninth Circuit's primary determination that Landrigan could not have intended to preclude all mitigating evidence, even that about which he could not have known due to counsel's failure to investigate. Id., 476. The majority concluded that much of the evidence that Landrigan claimed should have been investigated overlapped with the evidence that counsel had sought to present. Id. The majority noted that counsel had attempted to call Landrigan's birth mother to testify about her " 'drug us[e] during her pregnancy' . . . and the possible effects of such drug use." (Citation omitted.) Id. The majority also pointed to Landrigan's disruptive conduct when counsel tried to proffer anything that could have been consid-

ered mitigating as clear evidence "that Landrigan would have undermined the presentation of any mitigating evidence that his attorney might have uncovered." Id., 477. The majority did not directly respond to the four dissenting justices' criticism that it had not addressed the lack of neuropsychological information available to Landrigan at the time of his purported waiver, which could have established that Landrigan suffered from an organic brain disorder. Id., 482, 489 (Stevens, J., dissenting). The dissent argued that even if Landrigan knew all of the facts in his history that had led to this diagnosis, the court could not "assume that he could understand their consequences the way an expert psychologist could." Id., 491 (Stevens, J., dissenting).

The majority, however, did respond to the Ninth Circuit's decision to grant relief on the grounds "that the record does not indicate that Landrigan's decision not to present mitigating evidence was 'informed and knowing' . . . and that '[t]he trial court's dialogue with Landrigan tells us little about his understanding of the consequences of his decision . . . .'" (Citations omitted.) Id., 478–79. The court explained: "We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence. Cf., e.g., *Iowa* v. *Tovar*, 541 U.S. 77, 88 [124 S. Ct. 1379, 158 L. Ed. 2d 209] (2004) (explaining that waiver of the right to counsel must be knowing and intelligent). Even assuming, however, that an 'informed and knowing' requirement exists in this case, Landrigan cannot benefit from it, for three reasons.

"First, Landrigan never presented this claim to the Arizona courts. . . . Second, in Landrigan's presence, his counsel told the sentencing court that he had carefully explained to Landrigan the importance of mitigating evidence, 'especially concerning the fact that the [s]tate is seeking the death penalty.' . . . Counsel also told the court that he had explained to Landrigan that as counsel, he had a duty to disclose 'any and all mitigating factors . . . to th[e] [c]ourt for consideration regarding the sentencing.' . . . In light of Landrigan's demonstrated propensity for interjecting himself into the proceedings, it is doubtful that Landrigan would have sat idly by while his counsel lied about having previously discussed these issues with him. And as Landrigan's counsel conceded at oral argument before this [c]ourt, we have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence. . . . Third, the Court of Appeals overlooked Landrigan's final statement to the sentencing court: 'I think if you want to give me the death penalty, just bring it right on. I'm ready for it.' . . . It is apparent from this statement that Landrigan clearly understood the consequences of telling the judge that, 'as far as [he was] concerned,' there were no mitigating circumstances of which she should be aware."[10] (Citations omitted; footnote omit-

ted.) *Schriro* v. *Landrigan*, supra, 550 U.S. 479–80.

In assessing the impact of *Schriro* on the present case, two distinctions from the present case bear noting. First, *Schriro* and case law from lower courts on this subject involve mitigation evidence in the penalty phase of a capital case, wherein the absence of such evidence made it exceedingly likely that the defendant would be sentenced to death. Thus, the eighth amendment concerns informing the standards imposed in those cases do not apply to the present case. See, e.g., *Hamilton* v. *Ayers*, 583 F.3d 1100, 1113 (9th Cir. 2009) ("[b]ecause [t]he [c]onstitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy . . . [i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase" [citations omitted; internal quotation marks omitted]).

Second, *Schriro* involved the highly deferential review of state proceedings under the Antiterrorism and Effective Death Penalty Act of 1996 (federal act), Pub. L. No. 104-132, 110 Stat. 1214. *Schriro* v. *Landrigan*, supra, 550 U.S. 473. Under the federal act, reversal of a state court's adjudication is permitted only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States . . . or the relevant state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding . . . ." (Citations omitted; internal quotation marks omitted.) Id. Thus, the question in *Schriro* was whether the Supreme Court *previously* had held that a defendant's decision not to present mitigating evidence must be knowing and voluntary, not whether it would so hold if that question were presented to it. Indeed, the court went on to decide whether the waiver reasonably could be viewed as knowing and voluntary if such a standard applied. Clearly, the four dissenting justices believed that such a standard previously had been established. Moreover, although the federal act may preclude a federal court from overturning a state court's decision on the ground that the waiver of mitigation evidence was not informed and knowing; see, e.g., *Cowans* v. *Bagley*, 639 F.3d 241, 246–47 (6th Cir. 2011); that scheme does not constrain this court's resolution of that question.

A survey of case law preceding and postdating *Schriro* reveals that most courts have applied some sort of knowing and voluntary standard, expressly or implicitly, when evaluating the effect of a defendant's refusal to allow the presentation of mitigating evidence at the capital sentencing phase on either (a) the effectiveness of counsel or (b) the validity of a waiver of the right to present mitigating evidence.[11] See *Brawner* v. *Epps*, 439 Fed. Appx. 396, 402–408 (5th Cir. 2011)

(whether waiver of right to present mitigation case is knowing and voluntary is component of analysis of ineffective assistance of counsel claim), cert. denied, U.S. , 132 S. Ct. 2375, 182 L. Ed. 2d 1025 (2012); *Blystone* v. *Horn*, 664 F.3d 397, 423–26 (3d Cir. 2011) (concluding that state court unreasonably concluded that facts demonstrated that defendant made " 'knowing, intelligent, and voluntary' waiver of his right to present *any* mitigating evidence at sentencing" [emphasis in original]); *Allen* v. *Secretary, Florida Dept. of Corrections*, 611 F.3d 740, 763–64 (11th Cir. 2010) (noting in review of state court's decision that *Schriro* foreclosed argument that defendant's waiver of mitigation case should be deemed invalid because, due to lack of investigation, counsel failed to inform defendant of evidence he was giving up, but nonetheless explaining why waiver was knowing and intelligent), cert. denied sub nom. *Allen* v. *Buss*, 563 U.S. 976, 131 S. Ct. 2898, 179 L. Ed. 2d 1192 (2011); *Hamilton* v. *Ayers*, supra, 583 F.3d 1118–19 (defendant's decision not to allow presentation of mitigating evidence can excuse counsel's failure to present such evidence when defendant's decision is knowing, voluntary, and intelligent);[12] *Coleman* v. *Mitchell*, 268 F.3d 417, 447–49 (6th Cir. 2001) (counsel's effectiveness in connection with defendant's instruction not to present mitigating evidence determined in light of whether defendant's decision was knowing and informed); *Battenfield* v. *Gibson*, 236 F.3d 1215, 1231–34 (10th Cir. 2001) (counsel rendered ineffective assistance in failing to conduct adequate investigation despite defendant's instruction not to present any mitigating evidence because waiver was not knowing and intelligent); *Chandler* v. *Greene*, Docket No. 97-27, 1998 WL 279344, *8 (4th Cir. May 20, 1998) (affirming district court's conclusion that counsel was not ineffective for following defendant's knowing and voluntary decision to forgo presentation of mitigating evidence to jury) (decision without published opinion, 145 F.3d 1323 [4th Cir. 1998]), cert. denied, 524 U.S. 974, 119 S. Ct. 23, 141 L. Ed. 2d 783 (1998); *Emerson* v. *Gramley*, 91 F.3d 898, 906–907 (7th Cir. 1996) (defendant's waiver of right to present mitigating evidence was not knowing waiver to which he could be held in light of counsel's failure to conduct any investigation into mitigating evidence), cert. denied sub nom. *Emerson* v. *Gilmore*, 520 U.S. 1122, 117 S. Ct. 1260, 137 L. Ed. 2d 339 (1997), cert. denied sub nom. *Gilmore* v. *Emerson*, 520 U.S. 1139, 117 S. Ct. 1289, 137 L. Ed. 2d 364 (1997); *Snell* v. *Lockhart*, 14 F.3d 1289, 1302–1303 (8th Cir.) (defendant validly waived right to present mitigating evidence because choice was informed, voluntary, and intelligent), cert. denied sub nom. *Snell* v. *Norris*, 513 U.S. 960, 115 S. Ct. 419, 130 L. Ed. 2d 334 (1994); see also *Commonwealth* v. *Rega*, 593 Pa. 659, 711, 933 A.2d 997 (2007) ("[C]ertain jurisdictions require capital counsel to conduct an investigation into potential mitigation evidence to ensure that a defendant's waiver of such proof is know-

ing and intelligent. . . . Pennsylvania, however, aligns with those states that do not so require, demanding only that the defendant's waiver be knowing, intelligent, and voluntary." [Citation omitted.]), cert. denied, 552 U.S. 1316, 128 S. Ct. 1879, 170 L. Ed. 2d 755 (2008).

Precisely what such a standard requires appears to be context specific. Certain common factors can be gleaned from the jurisdictions that have applied this standard, however, which are consistent with those that *Schriro* indicated would apply if a knowing and intelligent waiver of mitigating evidence was constitutionally required. The record must establish that the defendant clearly and unequivocally expressed an intention not to present any mitigating evidence (or to limit the mitigation evidence). See *Schriro* v. *Landrigan*, supra, 550 U.S. 475–76; *Blystone* v. *Horn*, supra, 664 F.3d 425–26 (concluding that defendant's statement declining to " 'offer any other evidence' " did not suggest that defendant intended to preclude all mitigation evidence when read in context and when record established no basis to conclude that counsel had discussed mitigation evidence other than through testimony of defendant and his parents); *Loden* v. *McCarty*, 778 F.3d 484, 498–500 (5th Cir.) (record established "firm," "considered," "resolute" decision not to present any mitigation evidence), cert. denied sub nom. *Loden* v. *Fisher*, U.S. , 136 S. Ct. 402, 193 L. Ed. 2d 315 (2015); *Young* v. *Sirmons*, 551 F.3d 942, 959 (10th Cir. 2008) ("[W]e find it impossible to predict with any degree of certainty what [the defendant] would have done had his trial counsel investigated and prepared to present all of the available mitigating evidence that [the defendant] now points to. In particular, we do not believe that [his] decision to [forgo] the live testimony of his friends and family members allows us to accurately predict what he would have done had his trial counsel planned to present mitigating testimony from [certain experts]."), cert. denied, 558 U.S. 906, 130 S. Ct. 272, 175 L. Ed. 2d 183 (2009).

The record must also reflect that the defendant understood that he had the right to present mitigating evidence, the nature of the mitigating evidence, and the consequences of failing to present such evidence. *Schriro* v. *Landrigan*, supra, 550 U.S. 479–80; see also *Coleman* v. *Mitchell*, supra, 268 F.3d 447 (defendant must know "meaning of mitigation evidence and the availability of possible mitigation strategies" and have "understanding of competing mitigation strategies" [internal quotation marks omitted]); *Battenfield* v. *Gibson*, supra, 236 F.3d 1230–31 (waiver was not valid when petitioner instructed as to right but did not have understanding of general nature of mitigating evidence or specific types of mitigation evidence that might be available). This does not mean that the defendant must be fully informed about the specifics of the mitigation evidence. A higher standard would be inconsistent with

*Schriro* and the United States Supreme Court's waiver jurisprudence generally. See *United States* v. *Ruiz*, 536 U.S. 622, 629, 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002) ("the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances—even though the defendant may not know the specific detailed consequences of invoking it" [emphasis omitted]); see also *United States* v. *Demeke*, Docket No. 96-1413, 1998 WL 391051, *2 (2d Cir. May 20, 1998) (rejecting argument that district court had obligation to conduct full inquiry into applicability of diminished capacity defense to circumstances of case before allowing defendant to forgo defense in contravention to advice of counsel) (decision without published opinion, 152 F.3d 921 [2d Cir. 1998]).

Finally, although *Schriro* did not expressly address this concern, there is consensus that counsel may not acquiesce to such an instruction when there is evidence the defendant is not competent to make such a decision. See, e.g., *Brawner* v. *Epps*, supra, 439 Fed. Appx. 408; *Allen* v. *Secretary, Florida Dept. of Corrections*, supra, 611 F.3d 764–65; *Cummings* v. *Secretary for the Dept. of Corrections*, supra, 588 F.3d 1358–59; *Chandler* v. *Greene*, supra, 1998 WL 279344, *8; *Snell* v. *Lockhart*, supra, 14 F.3d 1303.

Accordingly, we agree with the United States Court of Appeals for the Eleventh Circuit that, if the record establishes that the petitioner made a knowing and intelligent decision not to present mitigating evidence under the general factors previously discussed, he must make two showings to establish prejudice under *Strickland*. First, the petitioner must show that if he had been advised more fully about the mitigating evidence, there is a reasonable probability he would have permitted trial counsel to present such evidence at trial. See *Gilreath* v. *Head*, 234 F.3d 547, 551 (11th Cir. 2000), cert. denied, 534 U.S. 913, 122 S. Ct. 255, 151 L. Ed. 2d 186 (2001); see also *Cummings* v. *Secretary for the Dept. of Corrections*, supra, 588 F.3d 1360 ("there cannot be a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigating evidence in any event"). Second, the petitioner must establish that, if such evidence had been presented, a reasonable probability exists that the result would have been different. *Cummings* v. *Secretary for the Dept. of Corrections*, supra, 1365–66. With these standards in mind, we turn to the petitioner's claims.

1

Failure to Discover Transcripts to Establish PTSD

The petitioner claims that he was prejudiced by defense counsel's failure to discover the 1966 transcripts because they deprived him of evidence that would have led to a diagnosis that he was under an

extreme emotional disturbance caused by PTSD at the time of the crimes. According to the petitioner, the transcripts revealed that he was in a dissociative state when he killed his father, which would have led to a diagnosis that he suffered from PTSD with dissociative features when he killed his former wife and his son. The petitioner argues that such a diagnosis would have presented a different basis for an extreme emotional disturbance defense than the severe mixed personality disorder diagnosed by the criminal trial experts, which effectively portrayed him as a pathologically jealous former husband, as it would explain his violent reaction to stressful circumstances. We conclude that, even if we were to assume that guilt phase counsel were deficient for failing to discover the transcripts, any such deficiency did not prejudice the petitioner.

Although the habeas court emphasized the fact that the petitioner would not agree to testify in support of an extreme emotional disturbance defense and might even insist on testifying to dispute that he had committed the crimes, our conclusion rests on a broader view of the record consistent with our previous discussion of the law.[13] The record provides ample proof that the petitioner had consistently and unequivocally taken the position that he would not allow counsel to present any mitigating evidence that was tantamount to an admission that he had committed the crimes, but lacked the intent to kill when he did so. The sole statements to the contrary came shortly after his arrest, between January 11 and February 20, 1988. Don Light, a defense investigator, noted that when he questioned the petitioner about his sister's report that he was having nightmares and flashbacks, the petitioner "became cheerful and made vague statements, such as, if I did it, I can't believe that I did. He also said is it possible that I could have done this and not be aware that I did so." Weeks later, the petitioner provided a detailed confession in his first interview with Borden, in the presence of Light and Kelly.

From March, 1988 until the defense rested in April, 1989, the petitioner, however, vehemently denied that account. When Borden met with the petitioner for the second time in March, 1988, two weeks after he had confessed to the crimes, the petitioner not only refused to discuss the events on the night of the murders but denied having committed the crimes. When Borden confronted him with his prior confession, the petitioner acknowledged the statement but said that he had made it up. He continued to maintain that he had not committed the crimes in subsequent interviews with Borden in September and December, 1988. Similarly, Phillips noted that, in her October, 1988 psychological evaluation, the petitioner insisted that he had no direct knowledge of the manner of the victims' deaths. In her report, Phillips further noted that, "[a]lthough he strongly denied knowledge of his family's murder, [the peti-

tioner] stated that 'I told them I did it . . . they needed somebody . . . I had no reason not to tell them . . . I have no reason to go on anymore.' "

The petitioner also repeatedly expressed a desire to either force the state to prove its case or to have the state execute him. In September, 1988, Light reported to defense counsel that, when he had informed the petitioner about his upcoming evaluation with Phillips, the petitioner had said that defense counsel promised him the best possible defense, that he wanted a trial, and that he wanted "the state to 'have to prove the case' so that they can 'zap me,' which is 'what I want.' " In response to this news, Kelly wrote a letter to the petitioner stating that Light had reported the petitioner's "expressed desire to have the [state] execute [him], and the effect of that attitude on the nature of any defense to be presented." Kelly asked the petitioner to keep an open mind on his options until defense counsel had a chance to assess all of the information and present him with his options.

At some unspecified point, the petitioner wrote a letter to Kelly stating in part: "I have no need of spending the rest of my life or any large part of it in a prison with unknown dreams, feelings and [an] uncertain knowing guilt. So my need is not to settle for anything lesser than the electric chair and without appeal which in turn will cause my death. For that's the least I can do. I can't feel or think of any other way!"

In her October, 1988 psychological evaluation, Phillips noted that the petitioner had said that " 'it's not worth trying to restart a life.' " The petitioner "expressed skepticism about his attorneys, doubting their commitment to helping him. He described the legal proceedings as a 'game' and stated that he was now only interested in seeing how 'the system is—how good or bad it is—how the game is played.' "

Sometime between the end of December, 1988 and the beginning of January, 1989, the petitioner rejected a plea bargain under which he would have avoided a death sentence but would have had to spend the rest of his life in prison. In a January, 1989 letter to the petitioner, defense counsel memorialized the two alternatives that the petitioner had rejected, one of which would have allowed him to enter an *Alford* plea[14] of guilty to two counts of murder. To ensure that the petitioner understood what this meant, the letter explained that an *Alford* plea would simply acknowledge that the state had sufficient evidence that, if believed by a jury, would likely establish his guilt, and would not be an admission that the petitioner had committed the crimes. The letter noted that counsel thought it was important to make this clear "[i]n light of the different positions you have taken with us at various times throughout the course of our representation ('I didn't do it'/'I did it'/'Maybe I did it'/'I don't remem-

ber') . . . ."

In that letter, defense counsel also recounted prior discussions with the petitioner regarding the fact that Borden's psychiatric evaluation gave them a potential extreme emotional disturbance defense. The letter explained that, if credited, extreme emotional disturbance would be a complete defense to capital felony, and would reduce the two murder counts to manslaughter in the first degree, which would likely result in maximum, consecutive sentences for a term of forty years imprisonment. It went on to note: "Despite the fact that an [extreme emotional disturbance] defense could, if successful, significantly reduce any penalty, you have forbidden us to use such a defense. We advised you before you made that decision that, in our opinion, defending the charges on an [extreme emotional disturbance] theory was the best way to go. Given your position on [extreme emotional disturbance], we will proceed accordingly, not because we agree that it is the best way to go, but because you, as the client have the power to make that decision, even if we feel it is not in your best interests. You should be aware, however, that we, therefore, will not file any Notice of Intention to Rely (on any kind of mental defense) as we are required to by law . . . ." The letter ended by advising the petitioner to inform counsel immediately if they had misunderstood his position with regard to rejecting the plea bargain or an extreme emotional disturbance defense. There is no evidence that the petitioner thereafter contacted counsel to indicate that they had misunderstood his position.

As noted in part I of this opinion, because of their concerns about the petitioner's statements and his rejection of their advice, defense counsel requested a competency evaluation in January, 1989. The evaluation noted that the petitioner "reported [that] his attorneys have discussed with him the possible defenses available. . . . He indicate[d] that he differs with his attorneys in his assessment of the strength of the evidence against him. He reports he is presently determined to take his case to trial, believing that the prosecution will have great difficulty proving his guilt 'beyond a reasonable doubt' to a jury." Following the clinical team's report to the court, two separate colloquies ensued with the petitioner. At each, the trial court confirmed with the petitioner that he had directed counsel not to present a defense of extreme emotional disturbance or "any psychiatric testimony," and that he understood that he was forgoing the possibility of a strategy that could avoid a death sentence and life imprisonment.

At the habeas trial, McWhirter testified that the petitioner had been adamant about not presenting evidence of extreme emotional disturbance at the guilt phase. McWhirter affirmed that he had explained to the peti-

tioner "the risk of pursuing the reasonable doubt defense instead of [extreme emotional disturbance] or other mental state defense." McWhirter stated that, in light of the petitioner's position, their defense strategy was "to make the state cross all the 'T's, dot all the 'I's, and prove the case beyond a reasonable doubt."

With respect to specifically using PTSD as the basis for an extreme emotional disturbance defense, McWhirter stated that he was sure that they had considered that condition, by that name or in another form. McWhirter had always assumed that the petitioner was in a dissociative state when he committed the murders. Although the petitioner was never specifically diagnosed with PTSD, McWhirter knew that the petitioner had traumatic events in his background that he thought had impacted the petitioner's mental state.

Kelly could not recall discussing PTSD with the petitioner, but explained that they had not considered relying on PTSD as an affirmative defense at the guilt phase "because as with [extreme emotional disturbance] we were faced with a certain dilemma and that dilemma was that [the petitioner], in effect, had indicated that if we tried to offer a defense that necessarily involved him having done the act of killing his family, that he would insist upon testifying and denying it. Thereby, in my view, making him not only a murderer, if the jury should so find, but someone capable of looking them in the face and being—and—and lying to them and being a liar on top of it, which then would have implications for the penalty phase."

This evidence conclusively demonstrates that the petitioner was informed, by the court and by counsel, that mitigation evidence could be presented that could reduce his culpability, and was advised against proceeding on a theory of reasonable doubt that had little chance of success. The court found the petitioner competent to make this decision, a finding that was supported by the opinion of an independent panel. That his decision made it more likely that he would be exposed to a death sentence rather than a lengthy sentence of imprisonment does not in and of itself contravene that finding.[15] The petitioner did not expressly limit or in any way qualify the scope of his decision to any particular extreme emotional disturbance theory or type of psychiatric testimony. Nor is there any evidence from which such a limitation may be inferred.

From his second meeting with Borden in March, 1988 until the defense rested at the guilt phase in April, 1989, the petitioner consistently refused to undertake any course of action that would be tantamount to an admission to having committed the crimes and insisted on forcing the state to prove its case beyond a reasonable doubt. The petitioner effectively took the position that the only acceptable outcome would be an acquittal or a death sentence. In either case, an extreme emotional

disturbance defense, whether based on PTSD or other mental conditions, would thwart that clear intention.

The mere fact that defense counsel never specifically discussed PTSD by its name and diagnostic features with the petitioner does not support a conclusion that a reasonable possibility existed that the petitioner would have allowed counsel to advance a defense based on PTSD if counsel had informed him that there was evidence to support such a theory. Defense counsel's investigation in support of an extreme emotional disturbance defense uncovered many of the same basic facts essential to the habeas experts' diagnosis of PTSD with dissociative features.[16] The habeas experts opined that the petitioner's PTSD arose from childhood trauma, events before and including his father's death. Borden opined that the severe chronic abuse that the petitioner had suffered when he was a child was the cause of the petitioner's mental disorder and had "led up to what happened." He characterized the death of the petitioner's father as an event that left a deep emotional scar and connected it to the 1987 killings. The habeas experts opined that methamphetamine intoxication would exacerbate PTSD symptoms of impulsivity and aggression. Borden reached the same conclusion regarding the drug's effects on the condition he had diagnosed, specifically stating that the drug could trigger violent behavior.[17] Phillips testified that the petitioner's illness would significantly reduce his ability to contain his emotions and rage if confronted with conflict or loss. The habeas experts opined that the 1966 event placed the petitioner at greater risk of responding to traumatic events by developing a dissociative reaction. Borden and Phillips described the petitioner's mental condition as one that could cause a person, when under severe stress, to "dissociate," experience "depersonalization," "derealization," or a "disoriented state," or go into a fugue state where one lacks awareness of what he is experiencing. Borden pointed specifically to the petitioner's perception that *he* was not harming the victims but rather that his *hand* had committed the harmful acts. Defense counsel testified that they "always" had thought that the petitioner was in a dissociative state attributable to his childhood abuse at the time of the killings, even though they did not attribute it specifically to PTSD.

Indeed, one of the petitioner's habeas experts who diagnosed the petitioner with PTSD, Blumberg, testified: "I think . . . Borden and I are in the same ballpark but may have some different diagnostic labels that we're using. . . . If you think that what . . . Borden has discussed in his diagnosis of this mixed personality disorder, all these features that he labels are actually features and symptoms of [PTSD]. . . . I would just really describe many of these features that he sees as part of his personality disorder as really being diagnostic of chronic [PTSD]."

We do not intend to suggest that PTSD and severe mixed personality disorder with the petitioner's associated features lack any clinically material distinction. Nor do we suggest that defenses based on PTSD and such a disorder would have had equivalent tactical advantages. Our concern is whether these diagnoses would have been seen as materially different from the petitioner's perspective when deciding to preclude an extreme emotional disturbance defense or the presentation of any psychiatric testimony. The record does not establish that there is a reasonable probability the petitioner would have allowed counsel to present a PTSD defense if only counsel had discussed PTSD by name, clinical definition, or symptomology.

To the extent that the petitioner argues that his decision was based on an extreme emotional disturbance defense limited to a theory that the petitioner committed the crimes because he was a sad, pathologically jealous man, the scope of the investigation and the testimony of Borden and Phillips does not support that limited view. It might be fair to say that the state pressed such a theory, but those characteristics were only one part of a far more complex picture of the petitioner's mental condition that defense counsel's investigation had yielded. Nothing in the record reflects that defense counsel ever discussed their proposed defense in such terms with the petitioner. The petitioner declined to testify on this or any other matter at the habeas trial.

For the foregoing reasons, the petitioner cannot establish that he was prejudiced by counsel's failure to uncover the 1966 transcripts. In light of his instructions to counsel and his refusal to assist in the development and presentation of mitigation evidence, there is not a reasonable probability of a different outcome if counsel had uncovered them. Moreover, because methamphetamine intoxication was an essential element of the opinions of each of the petitioner's experts, meaning that none concluded that PTSD alone caused an extreme emotional disturbance, the petitioner's PTSD claim also fails for the reasons set forth in the next subpart of this opinion.

2

### Failure to Test Blood Sample to Establish Methamphetamine (Desoxyn) Intoxication

The petitioner claims that although the habeas court properly concluded that counsel was deficient for failing to test the first blood sample because there was no strategic reason not to and such a test would have been the best evidence of intoxication, it improperly concluded that he was not prejudiced. He contends that the habeas court's finding that he rejected a defense strategy based on intoxication is clearly erroneous. The petitioner further contends that he could not have made

an informed decision to do so because counsel never discussed the presentation of intoxication evidence. We disagree.[18]

The record reflects the following additional evidence related to the intoxication claim. In his February, 1988 confession to Borden, in the presence of Kelly and Light, the petitioner recounted his alcohol and drug abuse in the years and months preceding the crimes, citing "drugs including [V]alium, [F]iorinal and [De]soxyn." In recounting the events in the days leading up to the murders early Sunday morning, December 13, 1987, the petitioner indicated that at various times on the preceding Wednesday and Thursday, he had been drinking and taking pills, including Desoxyn specifically, but could not remember how many pills. In his account of the events on Friday, Saturday, and early Sunday morning, he noted at several points that he had been drinking, but did not mention taking any pills or drugs.

Notes dated February, 1988, reflect that Light began an investigation into the petitioner's drug use in the days leading up to the crimes. He obtained a letter from the physician who had prescribed medications to the petitioner since 1985, which indicated that the physician had last prescribed Desoxyn to the petitioner on December 9, 1987 (three full days before the crimes). Light interviewed the pharmacist who had filled that prescription as well as previous prescriptions. The pharmacist indicated that the petitioner had previously abused his prescription medication, trying to obtain refills prematurely. The pharmacist confirmed that, on December 9, he had filled the petitioner's prescriptions for thirty Desoxyn pills and for 100 Fiorinal pills. Light learned that Desoxyn is an amphetamine and Fiorinal is a relaxant. Light found it "[n]otable" that, although the Desoxyn prescription specified a dosage of one pill per day, the petitioner's sister had informed Light that the bottle was empty when she found it in the petitioner's apartment five days after the prescription had been filled.[19] Light also contacted the petitioner's health insurance provider to ascertain when and for what prescriptions it had paid.

At the habeas trial, McWhirter confirmed that the petitioner's use of medications would have been a subject of inquiry because such use could be relevant to the petitioner's state of mind and a possible defense strategy. Light's report of his investigation into the petitioner's prescriptions and the empty prescription bottle gave McWhirter reason to believe that the petitioner may have been under the influence of more than his prescribed level of medication at the time of the murders. McWhirter testified that the petitioner had told defense counsel "from the beginning that he was under the influence . . . of alcohol and prescription medications . . . ." McWhirter further testified that, although he had no recollection of the specific inquiry to the

petitioner whether he was using any drugs or alcohol at the time of the murders, he was "quite sure that we had such a discussion at some point." He could not recall whether the petitioner had informed defense counsel of the quantity of each drug he had taken before the murders, but assumed the questions had been asked. As previously noted, McWhirter explained that the use of intoxication evidence "never got raised because [the petitioner] would not let us go in that direction."

We conclude that the habeas court's finding that the petitioner would not allow counsel to present intoxication evidence is not clearly erroneous. The habeas court credited McWhirter's testimony that intoxication had been discussed with the petitioner and that he would not allow them "to take this approach." Insofar as this is a pure credibility determination, it is unassailable. See *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 604, 103 A.3d 954 (2014) ("we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude" [internal quotation marks omitted]); *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 448, 936 A.2d 611 (2007) ("[t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony" [internal quotation marks omitted]). Indeed, the petitioner offered no evidence to the contrary.

Granted, this single statement alone would be a thin reed on which to rest the habeas court's ultimate finding. The evidence previously discussed, however, makes clear that this statement was not the only support for this finding. The evidence established that counsel had recognized that intoxication evidence could be used to raise a question as to the petitioner's ability to form the necessary specific intent, and had commenced an investigation into this subject. Defense counsel obtained information from the physician who prescribed medications to the petitioner, the pharmacist who filled the prescriptions, the insurance company who paid for the prescriptions, and a family member who had knowledge of the petitioner's usage. From these sources and the petitioner's confession, counsel learned what medications the petitioner actually had been prescribed shortly before the murders, that he previously had abused his medications, that he had been abusing them a few days before the murders, and that most of his thirty day supply of Desoxyn, received on December 9, was gone on December 14. The fact that no further investigation was undertaken would seem to corroborate that the petitioner had instructed counsel not to "go in that direction." Indeed, such an instruction was wholly consistent with the petitioner's refusal to allow the presentation of any theory tantamount to an admission to committing the homicides, and his expressed desire to make the state prove its case.

Despite the fact that the two colloquies with the criminal trial court were limited to the petitioner's decision not to present evidence of extreme emotional disturbance, we are persuaded that the record establishes that the petitioner understood the consequences of refusing to allow evidence of intoxication. Indeed, the only strategies that he ever embraced prior to the conclusion of the guilt phase were to obtain an acquittal or a sentence of death. A successful presentation of intoxication evidence would not achieve either end. Therefore, the petitioner's instructions to counsel preclude his claim that he was prejudiced by counsel's failure to test the blood sample because he has not established that he would have allowed evidence of intoxication had such a test been conducted.

Even if the petitioner could successfully distinguish a defense strategy based on intoxication from one based on an extreme emotional disturbance, he still could not establish the prejudice necessary to prevail on a claim of ineffective assistance. We agree with the habeas court that the petitioner did not proffer evidence establishing a reasonable probability that he ingested an intoxicating dose of Desoxyn at a point in time prior to the crimes when it would have materially affected his conduct during the commission of the crimes.

Putting aside the habeas court's questions as to whether the petitioner's experts accurately extrapolated from the blood sample a range of the level of methamphetamine at the time of the blood draw, the petitioner's expert, Stewart, conceded that these levels could be explained by the ingestion of Desoxyn shortly before the crimes, shortly after the crimes, or some combination thereof. He admitted that his intoxication opinion, therefore, relied upon an "assumption" that the petitioner had ingested the pills before the crimes, finding support for that assumption in the contrast between the petitioner's description of his state of mind during the crimes and others' description of his demeanor in the thirty-six hours afterward. According to Stewart, the petitioner's description was consistent with someone suffering from methamphetamine intoxication, whereas others' descriptions were "consistent" or "not inconsistent" with someone coming down from a methamphetamine high. Stewart admitted on cross-examination, however, that the petitioner's demeanor after the crimes was not inconsistent with someone suffering methamphetamine intoxication, and that it was possible for someone to be in such a state without it being readily apparent. Stewart's opinion did not account for the petitioner's strategic conduct upon leaving the crime scene of washing away any traces of blood from his person, clothing, and shoes. Moreover, Stewart's assumption that a single blood draw could reliably establish the petitioner's intoxication at a set point in time was not only contradicted by the respon-

dent's toxicology expert, Charles McKay, but also by the petitioner's toxicology expert, Gary Lage. Lage testified, consistent with McKay, that one could not tell from the level of methamphetamine in a single blood sample how much of the drug had been taken or when it was taken; one would need either the dosage or the time of ingestion to determine the other element.

The petitioner's experts also apparently gave no weight to the petitioner's own statements regarding his drug consumption, which would seem to be the best evidence of this fact and did not support a theory of methamphetamine intoxication. The petitioner's narrative to Borden contained no fewer than eight references to taking Desoxyn, "pills," or "drugs." He specifically recounted taking Desoxyn or "pills" as well as drinking at certain times on Wednesday and Thursday before the murders early Sunday morning. Although he recounted drinking (and, notably, even when, how many and what kind of alcoholic drinks he had) on Friday, Saturday, and the early hours of Sunday just before the murders, he never mentioned taking *any* pills during this period. Approximately thirty-two hours after the murders, when the petitioner was asked about his current medications at the emergency room for treatment of his cut hand, he mentioned Fiorinal but not Desoxyn. The petitioner's report to hospital personnel undermines the petitioner's argument that little weight should be assigned to his failure to mention taking Desoxyn in his account to Borden because no one specifically asked the petitioner whether he had taken any pills shortly before the crimes. When asked, he still failed to report recently taking Desoxyn. Therefore, the petitioner has not established that there is a reasonable probability that, had the blood sample been tested, a different result would have ensued.[20]

### 3
### Presentation of Reasonable Doubt Defense to Exclusion of Extreme Emotional Disturbance Defense

The petitioner argues that, because defense counsel recognized that a reasonable doubt defense had a marginal chance of success, they rendered ineffective assistance by failing to present a meritorious extreme emotional disturbance defense. The petitioner contends that defense counsel could not accede to the petitioner's direction not to assert an extreme emotional disturbance defense both because the petitioner's decision was uninformed and because it was a tactical decision for counsel to make. Parts III A 1 and 2 of this opinion dispose of the petitioner's first argument. We also disagree with his second argument.

Numerous courts have held that counsel has an ethical obligation to comply with an informed defendant's refusal to allow presentation of a mental disease or

defect defense or mitigating evidence in the penalty phase of a capital case. See *Frye* v. *Lee*, 235 F.3d 897, 906 (4th Cir. 2000) ("[I]n North Carolina—as in most jurisdictions—the client must be permitted by his lawyers to control his own defense, as long as he is fully informed in making his decisions. . . . Frye's attorneys took reasonable steps to comply with their professional responsibilities in this regard. Frye's decision not to allow his family to aid in mitigation was unchanged after repeated discussions where his lawyers explained their displeasure with his position, and the consequences thereof." [Citations omitted; internal quotation marks omitted.]), cert. denied, 533 U.S. 960, 121 S. Ct. 2614, 150 L. Ed. 2d 769 (2001); *Dobbs* v. *Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) ("the decision whether to use mitigating evidence is for the client"); *Adams* v. *Quarterman*, supra, 324 Fed. Appx. 347 ("although the decision whether to use [mitigation] evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit" [internal quotation marks omitted]); *Johnson* v. *State*, 117 Nev. 153, 162 and n.14, 17 P.3d 1008 (2001) ("[t]he majority of [s]tates honor a competent defendant's choice to forgo a defense strategy that asserts, in any way, that he or she was not guilty of the crime charged by reason of insanity—even over defense counsel's objections"; [internal quotation marks omitted]; and collecting cases).

The logic underlying these decisions extends to a client's instruction to his attorney not to present an extreme emotional disturbance defense. See *Petrovich* v. *Leonardo*, 229 F.3d 384, 386–87 (2d Cir. 2000) ("The decision to assert an affirmative defense [such as extreme emotional disturbance] is akin to other, fundamental trial decisions, such as the decision to plead to a lesser charge or to assert a plea of insanity. . . . If that analogy is sound, a court must accept a defendant's will in such matters." [Citations omitted.]), cert. denied, 532 U.S. 981, 121 S. Ct. 1623, 149 L. Ed. 2d 485 (2001); cf. *State* v. *Jones*, 99 Wn. 2d 735, 743, 664 P.2d 1216 (1983) (en banc) ("The stigma of insanity may in some cases be more damaging. Finally, a defendant may have legitimate philosophical reasons for opposing entry of [a not guilty by reason of insanity] plea. He may view such a plea as a tacit admission of guilt which he does not wish to make."). To conclude otherwise could force a defendant to represent himself in order to control the defense that he wishes to present. See, e.g., *Godinez* v. *Moran*, 509 U.S. 389, 392, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) ("[The] respondent informed the court that he wished to discharge his attorneys and change his pleas to guilty. The reason for the request, according to [the] respondent, was to prevent the presentation of mitigating evidence at his sentencing."); *Johnson* v. *State*, supra, 117 Nev. 161 ("the record reflects that [the defendant] asserted his right to self-representation

mainly because of the 'conflict of interests' arising out of his differences with his counsel over the insanity defense").

We also flatly reject the petitioner's contention that, even if defense counsel could not advance an extreme emotional disturbance *argument*, they still could (and should) have presented *evidence* supporting that theory. The only substantive evidence supporting such a theory would have been elicited, perforce, from the petitioner himself, who plainly was not willing to support such an effort, or from one of the defense mental health professionals, whose testimony the petitioner advised the court he did not want. We fail to see how such an approach would be faithful to the petitioner's emphatic instructions. The fact that an extreme emotional disturbance instruction may be given despite a defendant's refusal to pursue such a defense is not to the contrary. See, e.g., *State* v. *Asherman*, 193 Conn. 695, 729–31, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). This instruction inures at least equally to the state's benefit so as not to require a jury to acquit a defendant if a reasonable doubt arises as to intent or some other element of the offense. See id., 731–32. Accordingly, defense counsel's reluctant acquiescence to the petitioner's insistence on proceeding exclusively under a defense of reasonable doubt did not constitute ineffective assistance of counsel.

### B

### Ineffective Assistance of Counsel in the Petition for a New Trial

The petitioner claims the habeas court improperly concluded that he had no statutory or constitutional right to counsel in his petition for a new trial and thus no corresponding right to effective assistance. He contends that every federal circuit to address this issue has concluded that a posttrial, preappeal motion for a new trial is a critical stage of the criminal proceedings, to which the constitutional right to counsel attaches, and that his petition for a new trial is subject to this same treatment. We disagree.

A predicate to the right to effective assistance of counsel is the right to counsel. See *McMann* v. *Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970) ("[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel"). "The [s]ixth [a]mendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process." *Iowa* v. *Tovar*, supra, 541 U.S. 80–81. As the respondent properly points out, there are substantive differences between a motion for a new trial and a petition for a new trial under Connecticut law that explain why the former is a critical stage of the criminal process and

the latter is not.

A motion for a new trial is filed "within the technical confines of the docketed criminal case. No separate civil action [i]s brought. . . . [A] petition [for a new trial] is instituted by a writ and complaint served on the adverse party; although such an action is collateral to the action in which a new trial is sought, it is by its nature a distinct proceeding. The judgment on the petition terminates the suit which renders it final. On the contrary, a motion for a new trial is filed in a case then in progress or pending and *is merely a gradation in that case leading to a final judgment.* . . . [E]rrors which are claimed to have been committed in rendering the judgment on a petition for a new trial are not reviewable on an appeal from the judgment rendered in the action in which a new trial is sought. . . . On the other hand, errors which are claimed in relation to a motion for a new trial may be assigned on the appeal from the judgment rendered in the case in which the motion is made." (Citations omitted; emphasis added; footnote omitted.) *State* v. *Asherman*, 180 Conn. 141, 143–44, 429 A.2d 810 (1980); accord *State* v. *Goodwin*, 3 Conn. Cir. Ct. 386, 388, 215 A.2d 913, cert. denied, 153 Conn. 725, 213 A.2d 525 (1965).

For the preceding reasons, a motion for a new trial is a critical stage of the criminal proceedings, to which the right to counsel attaches, whereas a petition for a new trial is a distinct proceeding. The latter is related to and can affect the criminal judgment in the same way that a habeas proceeding may. There is no constitutional right to habeas counsel, however, only a statutory right. See *Gipson* v. *Commissioner of Correction*, 257 Conn. 632, 646 nn.19 and 20, 778 A.2d 121 (2001). The statutory right to counsel has not been extended to petitions for a new trial. See General Statutes § 51-296 (a). Therefore, the habeas court properly determined that the petitioner could not advance a claim of ineffective assistance of counsel in his petition for a new trial.

C

Cumulative Error

The petitioner contends that the habeas court improperly concluded that his claims that the cumulative prejudicial effect of counsel's deficient performance either constituted ineffective assistance or a violation of due process were not cognizable under Connecticut law. He contends that cumulative error is a valid basis on which to grant relief under federal and Connecticut case law.

It appears to be an open question whether such claims are cognizable under Connecticut law. Compare *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 95, 136 A.3d 596 (2016) ("even if we were to recognize the [due process] cumulative error doctrine as articulated in the federal courts and to deem it applicable to habeas pro-

ceedings, the trial improprieties in the present case would not justify relief under that doctrine"), with *State* v. *Harris*, 182 Conn. 220, 232, 438 A.2d 38 (1980) ("The final portion of the cumulative error argument concerns the ineffectiveness of the defendant's trial counsel. Because this claim has an independent basis in the sixth amendment to the United States constitution, we review the defendant's contentions in this respect both as combining with the first two categories of cumulative error resulting in the denial of a fair trial and on its own merits with respect to the defendant's independent right to the effective assistance of counsel."). Nonetheless, we need not resolve this question in the present case. We have previously concluded that any purported deficiencies caused no prejudice to the petitioner in light of his refusal to aid in presenting mitigation evidence and his resolute instructions to his attorneys not to present any such evidence. In other words, there is no prejudice to aggregate.

D

*Brady* Violation for Failing to
Disclose 1966 Transcripts

Finally, the petitioner contends that the habeas court improperly concluded that the state did not suppress the 1966 transcripts in violation of *Brady* because defense counsel's discovery requests did not seek these documents and the state's open file policy was sufficient to discharge its *Brady* obligations. In light of our conclusions in part III A 1 of this opinion, the petitioner cannot prevail even if this contention is correct.

"In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Smith*, 313 Conn. 325, 348, 96 A.3d 1238 (2014). "[T]he test for materiality under *Brady* and the test for prejudice under *Strickland* [for ineffective assistance of counsel] are the same . . . ." *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 266–67, 112 A.3d 1 (2015). Because we have already concluded that the petitioner failed to establish prejudice under *Strickland* in relation to these transcripts, he cannot establish that they are material under *Brady*.

E

Conclusion

The habeas court properly concluded that the petitioner had not established a basis for relief on any of his claims challenging his judgment of conviction. In light of intervening changes in the law, the petitioner's claims challenging the penalty phase and resulting sentence of death have been rendered moot. The petitioner is free to file a motion to correct an illegal sentence pursuant to Practice Book § 43-22.

The appeal is dismissed with respect to the petitioner's claims regarding the imposition of a sentence of death; the judgment is affirmed.

In this opinion the other justices concurred.

* This case was originally argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald and Robinson. Thereafter, Justice Zarella retired from this court and did not participate in the consideration of the case.

[1] The trial court, *Heiman, J.*, rendered judgment with respect to the capital felony count only and not the lesser included murder counts in light of the double jeopardy clause of the fifth amendment to the United States constitution. See *State* v. *Breton*, 264 Conn. 327, 333, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Breton*, 235 Conn. 206, 215 n.8, 663 A.2d 1026 (1995).

[2] General Statutes (Rev. to 1987) § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person. . . ."

[3] The petitioner's account was remarkably similar to the narrative that the state had presented to the jury at the guilt phase, which it had constructed on the basis of physical evidence at the scene. See *Breton II*, supra, 235 Conn. 212–14.

[4] In *Breton III*, this court interpreted a statement Borden made to mean that the petitioner had said that he thought he had seen someone walking around "inside." *Breton III*, supra, 264 Conn. 346. No one expressly referred to inside, however, and it is clear from the totality of the evidence that the petitioner indicated that he thought he had seen someone outside the apartment. Borden initially testified that the petitioner had stated that while he was sitting in his truck, he thought he saw "someone walking around the house," and later clarified that the petitioner had said that he had seen someone walking around outside. The latter is consistent with a contemporaneous report of the petitioner's narrative to Borden, as well as the petitioner's account of the events after he entered the apartment, which do not reflect any concern that a stranger might be present inside. In fact, a witness testified at the guilt phase that he was outside at the apartment complex at approximately 4:30 a.m. when he observed the petitioner leaving the apartment and thought that the petitioner had looked right at him.

[5] The state suggested that this comment reflected the petitioner's anger that neither his son nor his former wife had sent a card for the petitioner's birthday, which was December 10, three days earlier.

[6] The record does not make clear why the petition was withdrawn *with prejudice.*

[7] The long gap between the criminal trial and the habeas trial stems from several factors. As a result of the petitioner's three appeals to this court, and a petition for certification to appeal to the United States Supreme Court, the judgment in the petitioner's criminal trial was not final until 2003. Then, several years lapsed due to a shared assumption by the parties that this habeas case would not go forward until the resolution of another habeas proceeding concluded in which the petitioner's claim of unconstitutional racial disparities in the administration of the death penalty was consolidated with those of other petitioners raising that claim. Eventually, the present habeas action proceeded, after it became evident that the consolidated habeas action was not going to conclude in the near term. The latter was concluded in 2013. See *In re Death Penalty Disparity Claims*, Superior Court, judicial district of Tolland, Docket No. CV-05-4000632-S (October 11, 2013).

[8] "While intoxication is neither a defense nor an affirmative defense to a

murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder." *State* v. *Stevenson*, 198 Conn. 560, 568, 504 A.2d 1029 (1986); see General Statutes § 53a-7 ("[i]ntoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged").

[9] Mark Rademacher filed the petition in 1999, but Norman Pattis and James Nugent assumed representation of the petitioner in 2002. Pattis and Nugent were claimed to have been ineffective.

[10] The majority also concluded that the mitigating evidence at issue would not have changed the result. See *Schriro* v. *Landrigan*, supra, 550 U.S. 481.

[11] In cases in which there was only a challenge to counsel's failure to present mitigating evidence, not to counsel's failure to investigate such evidence, several state courts have required, as a matter of state law, that a waiver of the right to present mitigating evidence must be knowing, voluntary, and intelligent. See *State* v. *Hausner*, 230 Ariz. 60, 84–86, 280 P.3d 604 (2012) (en banc); *Koon* v. *Dugger*, 619 So. 2d 246, 248–50 (Fla. 1993); *St. Clair* v. *Commonwealth*, 140 S.W.3d 510, 560–61 (Ky. 2004); *State* v. *Short*, 129 Ohio St. 3d 360, 368–69, 952 N.E.2d 1121 (2011); *State* v. *Johnson*, 401 S.W.3d 1, 13 (Tenn.), cert. denied,     U.S.    , 134 S. Ct. 513, 187 L. Ed. 2d 371 (2013). At least one state court has treated this standard as constitutionally mandated, albeit prior to *Schriro*. See *State* v. *Woods*, 143 Wn. 2d 561, 609, 23 P.3d 1046 ("[l]ike other constitutional rights, a defendant may waive the right to present mitigating evidence so long as the waiver is made 'knowingly, voluntarily, and intelligently' "), cert. denied, 534 U.S. 964, 122 S. Ct. 374, 151 L. Ed. 2d 285 (2001). Most of these state courts require a colloquy to ensure that this standard has been met. There is a split among these courts as to whether it is proper to inquire into the nature of the mitigating evidence that counsel had discussed with the defendant.

[12] The Ninth Circuit appears to be alone in concluding that *Schriro* "is inapplicable where the defendant did not threaten to obstruct the presentation of any mitigating evidence that counsel found," and therefore does not apply when a defendant directs counsel not to present mitigation evidence. (Internal quotation marks omitted.) *Stankewitz* v. *Wong*, 698 F.3d 1163, 1170 n.2 (9th Cir. 2012); see, e.g., *Newland* v. *Hall*, 527 F.3d 1162, 1205 (11th Cir. 2008) ("[w]hile [the] petitioner's conduct in this case is not as extreme as the defendant's conduct in *Schriro*, we follow the [c]ourt in drawing a distinction between a defendant's passive [noncooperation] and his active instruction to counsel not to engage in certain conduct"), cert. denied, 555 U.S. 1183, 129 S. Ct. 1336, 173 L. Ed. 2d 607 (2009).

[13] We agree with the petitioner that his refusal to admit to committing the crimes would not preclude the presentation of such a defense solely through expert testimony. We also agree with the petitioner that the risk that he might insist on testifying to disavow having committed the crimes would not preclude successfully establishing that defense. In fact, in Borden's testimony at the first penalty phase hearing to establish mitigation, defense counsel elicited testimony on that very issue. Borden testified that, after their first meeting, the petitioner disavowed having committed the crimes and, when confronted with his earlier confession, the petitioner claimed that it was just "a story." Borden discussed this retraction in a manner to bolster his diagnosis of severe mixed personality disorder.

[14] *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[15] As the Eleventh Circuit explained: "[A] mentally competent, intelligent defendant, having been convicted of a brutal murder, faced life imprisonment or death. Insisting on doing things his way, he chose death and prevented his counsel from attempting to secure a life sentence through the development and presentation of mitigating circumstances evidence. That is not a choice that most people would have made, but it is one that he had the right to make, and he made it voluntarily and with full awareness of the consequences. . . . What [the defendant] does not have is the right to escape the consequences of his own decision not to present any mitigating circumstances evidence by shifting the blame for it to someone else." (Citation omitted.) *Allen* v. *Secretary, Florida Dept. of Corrections*, supra, 611 F.3d 765.

[16] We also note that when Phillips reviewed the 1966 transcripts in 2002, she thought that they were significant, but did not contradict previous findings. Rather, they provided stronger evidence in support of a conclusion that the petitioner was experiencing a dissociative episode when he killed

his former wife and his son. Like Borden, she believed that further testing would be required to make additional diagnoses. The petitioner, however, would not meet with the criminal trial experts after December, 1988. No effort was made to have Phillips or Borden undertake such testing for the habeas trial. Rather, the petitioner's habeas experts largely relied on information previously provided by the petitioner to Borden in February, 1988, and supplemented that information with tests they administered to the petitioner more than twenty years after the criminal trial.

[17] Blumberg drew a material distinction between PTSD and mixed personality disorder with respect to whether those conditions would be affected by methamphetamine intoxication. He opined that methamphetamine intoxication would exacerbate PTSD but not mixed personality disorder.

[18] Although we base our decision on *Strickland*'s prejudice prong, we note that our review of the record yielded evidence that calls into question whether the petitioner proved that counsel's performance was deficient. The habeas court could not envision a *tactical* reason not to test the sample, but that conclusion necessarily presupposed that counsel knew or should have known about the effects of Desoxyn on a person with the petitioner's mental condition when investigating the case prior to the 1989 guilt phase. Differences in Borden's testimony at the two penalty phase hearings, however, suggest that Desoxyn's dangers, in general or in specific to someone with the petitioner's mental disorders, were not generally known to the medical community in 1989. When Borden testified at the first penalty phase in 1989, he offered limited, innocuous testimony about Desoxyn, simply describing it as "a diet pill which gives you a high. [It] was one of the first antidepressants." When Borden testified at the second penalty phase in 1997, he characterized the drug's effects as far more dangerous—a methamphetamine with a potent stimulant effect, ten times more powerful than cocaine, the worst medication that could have been prescribed for someone with the petitioner's mental illness, a drug that could trigger violent behavior, and a drug that when used in combination with alcohol would be like "throwing gasoline" on a "simmering fire." When questioned about the differences between his testimony, first by the state and then on redirect by the defense, Borden explained that the medical community's knowledge about the deleterious effects of the drug had greatly evolved since 1989, so much so that the drug was no longer prescribed. An evolved state of knowledge would explain why the defense's list of mitigating factors expressly included intoxication in the second penalty phase and not in the first penalty phase. In assessing whether the defense's investigation was deficient, *Strickland* requires us to focus on counsel's perspective at the time investigative decisions were made. See *Rompilla* v. *Beard*, supra, 545 U.S. 381.

We note that if neither Borden nor defense counsel knew about Desoxyn's potential dangers, defense counsel's discussions regarding the use of intoxication evidence could have been directed at the petitioner's use of other prescription medications as well as alcohol consumption. Borden also testified at the second penalty phase that the effects of Fiorinal, a barbiturate, are dangerous for a disturbed person and its effects are amplified when mixed with alcohol. Nonetheless, because both parties implicitly assume that Borden, and, in turn, the defense, knew about Desoxyn's dangers, our analysis similarly proceeds from such an assumption.

[19] The petitioner's sister testified at the second penalty phase that the thirty day supply was "almost all gone" when she found it. She was never asked to quantify that remark.

[20] The petitioner's reliance on *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 293–94, 112 A.3d 1 (2015), for the proposition that he met his burden of proof because a jury reasonably *could* have credited his experts' opinions and find a reasonable doubt as to his specific intent due to intoxication is misplaced. In *Lapointe*, we declined to defer to the habeas court's finding that the opinions of the petitioner's experts were not persuasive because the habeas court's criticism of those experts' opinions was not premised on a credibility assessment, but instead on facts that were manifestly contradicted by the record. Id., 276–89. In light of the lack of support for the habeas court's finding, we scoured the record to determine whether it revealed any other apparent reason why a jury would be apt to discredit the testimony of the petitioner's experts. Id., 290. In the present case, the habeas court reasonably found that the petitioner's experts had failed to establish a credible and adequate foundation for their intoxication opinion.